JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United Healthcare Services, Inc.

**DEFENDANTS**

Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc.

**(b)** County of Residence of First Listed Plaintiff    Hennepin, Minnesota
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Morris, New Jersey
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stradley Ronon Stevens & Young, LLP
LibertyView, 457 Haddonfield Road, Suite 100, Cherry Hill, NJ 08002
856-321-2400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☒ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☒ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | |
| | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332; 18 U.S.C. 1962

Brief description of cause:
Fraud, RICO, RICO Conspiracy, Tortious Interference, Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
November 16, 2022

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

STRADLEY RONON STEVENS & YOUNG, LLP
A Pennsylvania Limited Liability Partnership
By: Francis X. Manning and Robert J. Norcia
457 Haddonfield Road, Suite 100
Cherry Hill, NJ 08002
Tel: (856) 321-2403
Fax: (856) 321-2415
Email: fmanning@stradley.com; rnorcia@stradley.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., 990 Bren Road East, Minnetonka, MN 55343<br><br>Plaintiff,<br><br>vs.<br><br>TEVA PHARMACEUTICALS USA, INC., 400 Interpace Pkwy, Parsippany, NJ 07054<br><br>And<br><br>TEVA NEUROSCIENCE, INC., 11100 Nall Ave Overland Park, KS 66211,<br><br>Defendants. | No.<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

United Healthcare Services, Inc. ("United") brings this Complaint against Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc. (collectively, "Teva") and alleges as follows:

### NATURE OF THE ACTION

1. This is an action to recover tens of millions of dollars that United paid to Teva as a result of Teva's unlawful conspiracy and fraudulent scheme to effectively waive the cost-sharing obligations of members of United's various Medicare plans so that Teva could inflate the price

of its prescription drug for treatment of multiple sclerosis ("MS"), Copaxone, with impunity and to illegally induce patients to use Copaxone rather than cheaper alternatives to treat MS.

2. Between 2006 and 2015, Teva raised the price of Copaxone at a rate more than 19 times that of inflation. The price of the drug vaulted from roughly $17,000 to well over $70,000 per year. But Copaxone sales remained steady. As a result, Teva reaped billions of dollars in profit. Teva managed this improbable feat by breaking the law, concealing its actions, and deceiving managed-care companies like United even as the drug's price rocketed past the point at which most patients could or would pay.

3. Beginning in 2006, Teva engaged in a conspiracy to inflate Copaxone's price. It secretly coordinated with two purportedly independent patient charities, Chronic Disease Foundation ("CDF") and The Assistance Fund Inc. ("TAF"), to make and conceal illegal payments to Copaxone patients.

4. Teva's payments were targeted to eliminate the portion of Copaxone's cost typically borne by patients in the form of cost sharing obligations like co-pays, deductibles, and co-insurance.  This allowed Teva to avoid the principal restraint on exorbitant drug prices in the United States: the price sensitivity of consumers. Teva's illegal payments effectively rendered the drug "free" to patients, permitting Teva to raise Copaxone's price well beyond what the market could otherwise bear and leaving the patients' health plans and insurers to foot the large majority of the inflated bill.

5. Teva successfully hid its scheme for years until an investigation by the Department of Justice ("DOJ") recently dragged it into the light. Documents uncovered by the DOJ provide a detailed window into the inception and execution of Teva's scheme.

6. In 2006, Teva enlisted Advanced Care Scripts ("ACS"), a pharmacy, to dispense Copaxone to Medicare patients. ACS directed Copaxone patients insured under Medicare plans to apply for financial assistance from CDF and TAF. CDF and TAF would handle the application process and pay the patient's share of Copaxone's cost. ACS also provided Teva with detailed information on the number of Copaxone patients seeking and receiving assistance from the two charities.

7. AssistRX, Inc. ("AssistRX")—another pharmacy under contract with Teva—identified and referred Medicare-eligible patients to ACS and ultimately assumed ACS' duties related to "charitable" cost-sharing assistance in 2015.

8. Teva further enlisted CDF and TAF themselves in the scheme. Teva obtained information from CDF and TAF that, coupled with input and aid from ACS and AssistRX, allowed Teva to use CDF and TAF as conduits for payments to Copaxone patients. Teva coordinated with CDF and TAF to make payments to them tailored to cover the cost-sharing obligations of Copaxone patients, which CDF and TAF effectively laundered and routed directly to those patients. The effect was to disguise Teva's payments to Copaxone patients as "charitable donations," disbursed by purportedly independent patient charities.

9. This false veneer of charity was necessary because Teva's scheme was patently illegal. Among other things, it violated the federal False Claims Act, the federal Anti-Kickback Statute, and various state laws that similarly prohibit pharmaceutical companies from secretively covering their own customers' cost-sharing obligations. These laws are meant to prevent precisely what happened in this case. Indeed, both ACS and AssistRX have paid the federal government millions of dollars to settle claims arising out of the very conduct described in this Complaint. CDF has likewise paid the government millions to settle claims concerning

3

materially identical conduct, as have numerous other pharmaceutical companies in recent years. Teva itself now faces a lawsuit by the United States government seeking recovery of hundreds of millions of dollars the government paid for Copaxone through the Medicare program.

10. But before Teva and its co-conspirators got caught, the scheme worked precisely as planned. Between 2006 and 2015, Teva raised the price of Copaxone dramatically without hurting sales. During that time, its annual net revenues from Copaxone in the United States shot up from approximately $920 million to more than *$3 billion*. By 2015, Copaxone ranked fifth out of the top ten most expensive drugs that accounted for nearly a third of all drug spending in the United States for catastrophic coverage under Medicare Part D.[1] CDF and TAF likewise reaped significant profits, taking a 9% cut of Teva's "donations" as an administrative fee.

11. Documents uncovered by the DOJ show Teva fully understood that the financial success of Copaxone depended on Teva's ostensibly "charitable" donations to CDF and TAF. Indeed, Teva's tax department ultimately recommended that these payments be categorized as business expenses rather than charitable donations, as they were "made with the expectation of financial return commensurate with the amount donated."

12. These profits came at the expense of taxpayers and managed-care companies like United. As a direct result of Teva's scheme, Medicare programs have spent many hundreds of millions of dollars annually to cover the inflated cost of Copaxone since 2006. United, as a sponsor of Medicare Part D plans, paid out approximately $100 million out of its own pocket for Copaxone between just 2010 and 2015 on behalf of Medicare beneficiaries.

---

[1] Department of Health and Human Services, Office of Inspector General, *High-Price Drugs Are Increasing Federal Payments for Medicare Part D Catastrophic Coverage* (Jan. 2017), https://oig.hhs.gov/oei/reports/oei-02-16-00270.asp.

13. Because the claims submitted to United's Medicare plans for Copaxone were tainted by Teva's illegal kickback scheme, they were not payable under federal law. United paid these claims only because it was deceived into doing so by the conspiracy.

14. Moreover, Teva's conduct subverted key terms of United's contracts with its members. United's Medicare plans require members to share in the cost of prescription drugs. By paying illegal kickbacks to induce the purchase of Copaxone, Teva caused those members to breach their contracts with United.

15. Drug prices are higher in the United States than anywhere else in the world. For example, consumers in the United States pay three times more for the world's 20 top-selling drugs than do consumers in the United Kingdom. Cost-sharing is thus a cornerstone of the Medicare program, instituted by Congress in part as "a safeguard against inflated drug prices."[2] This promotes prudent consumption and spurs price competition in the pharmaceutical market. Teva deliberately undermined these goals with its scheme, to the ultimate detriment of insurers, administrators, and insureds alike. Teva's scheme thus harmed not only insurers but also the public at large.

16. Accordingly, United now brings suit to recover its damages and put a stop to Teva's unlawful scheme.

## PARTIES

17. Plaintiff United Healthcare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. United

---

[2] Department of Justice, *Drug Maker Actelion Agrees to Pay $360 Million to Resolve False Claims Act Liability for Paying Kickbacks* (Dec. 6, 2018), https://tinyurl.com/y67zsuj9.

Healthcare Services, Inc. fully insures and administers health plans, including Medicare Part D plans at issue in this litigation.

18. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a corporation organized under the laws of Delaware with its principal place of business in Parsippany, New Jersey. Teva is a subsidiary of Teva Pharmaceuticals Industries Ltd.

19. Defendant Teva Neuroscience, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Overland Park, Kansas. It is a wholly-owned subsidiary of Teva USA.

20. Teva Neuroscience and Teva USA were individually and collectively involved in the schemes alleged herein. Their wrongful conduct was authorized, ordered, and/or undertaken by Teva's various officers, agents, employees, or other representatives while actively engaged in the management of Teva's affairs. That conduct was undertaken within the course of the employment of Teva's officers, agents, employees, or other representatives, within the scope of their duties, and with their actual, apparent, or ostensible authority.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between United and Teva and the amount in controversy exceeds $75,000.

22. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, United asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq*. The Court likewise has subject matter

jurisdiction over United's state and common law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

23. This Court has personal jurisdiction over the defendants in this action because Teva USA maintains its principal place of business in this district, and Teva Neuroscience undertook relevant conduct in, and purposely directed relevant conduct to, this jurisdiction.

24. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action have occurred in this district.

## BACKGROUND ALLEGATIONS

### Multiple Sclerosis and Copaxone

25. MS is a disease in which the immune system causes inflammation in the central nervous system that damages myelin—a fatty coating that protects nerve fibers—causing a variety of neurological symptoms. These symptoms can include fatigue, weakness, difficulty walking, vision problems, cognitive changes, and many others. Nearly one million people in the United States suffer from MS. Its cause is unknown.

26. There are four types of MS: Clinically Isolated Syndrome ("CIS"), Relapsing-Remitting MS ("RRMS"), Secondary Progressive MS ("SPMS"), and Primary Progressive MS.

27. Several medications are available to treat MS depending on the type of condition. Some of these treatments are "disease modifying," meaning that they slow down the natural course of MS. Other treatments are available to manage MS symptoms. However, there is no cure for MS. MS drugs therefore require regular doses indefinitely.

28. Copaxone is a disease-modifying drug manufactured by Teva. Teva obtained FDA approval for Copaxone to treat CIS, RRMS, and SPMS in 1996. It has since become one of Teva's most profitable drugs, generating billions of dollars in annual sales.

29. Copaxone, taken by injection, helps block damage to myelin. It comes in a 40 mg/ml formulation, which must be injected three times per week, and a 20 mg/ml formulation, which must be injected daily.

30. The 40 mg/ml formulation costs nearly $6,000 per month, and $70,000 per year. The 20 mg/ml formulation costs over $7,000 per month and over $85,000 per year.

**Benefit Design and Impact of Cost-Sharing Waivers**

31. Health plan members play an essential role in managing healthcare costs because there are no formal legal constraints on drug prices in the United States.

32. One way health plans address this issue is by including cost-sharing obligations and contingent coverage as part of their benefit designs.

33. Cost-sharing obligations refer to a member's responsibility to pay out-of-pocket for some portion of the cost of the healthcare service.

34. Cost-sharing obligations are intended to cause behavioral shifts in members' decisions regarding healthcare services. The intent of cost-sharing is to provide an incentive for members and their physicians to use lower-cost alternatives when possible. And if alternatives are not available, members' inability to pay cost-sharing obligations is intended to have downward pressure on the pricing of expensive drugs.

35. Unwilling to lower their prices, many drug manufacturers have attempted to circumvent the downward pricing pressure caused by member cost-sharing obligations by either waiving those cost-sharing obligations or by paying those cost-sharing obligations on behalf of

the members. The result of these waivers or payments by the drug manufacturers is that the member is not exposed to the cost of the drug, allowing manufacturers to maintain already high prices or inflate prices further without having to worry about objections or outcry from the end-user patients.

36. The effect of cost-sharing waivers on drug prices is well studied. For example, a large study conducted in Germany in 1989 showed that when drug companies were prevented from waiving cost-sharing obligations, drug prices dropped on average between 10 and 26 percent. In other words, prior to this prohibition, the drug manufacturers had been able to substantially inflate prices simply by waiving required patient responsibility.[3]

37. Researchers have also discussed the effect of drug-company sponsored patient assistance programs. Specifically, in a 2009 article,[4] researchers noted:

> Drug company-sponsored PAPs [Patient Assistance Programs] may inhibit cost-effective medication use, and their widespread use may have important implications for public drug spending. This potential impact must be better understood. Drug company–sponsored PAPs may steer patients toward and lock them into a particular manufacturer's product, even when other equally effective and less costly alternatives are available. If these patients ultimately acquire better coverage, then they may request unnecessarily expensive medications. In the case of Medicare Part D, patients' prior use of PAPs that provide subsidies for brand-name products may lead to higher overall individual and public drug spending.

38. Similarly, a 2014 article in the New England Journal of Medicine[5] explained:

> Assistance programs are a triple boon for manufacturers. They increase demand, allow companies to charge higher prices, and provide public-relations benefits. Assistance programs are an especially attractive proposition for firms that sell particularly costly drugs. Faced with high out-of-pocket costs, some patients may decide against taking an expensive medication. Patient-assistance programs can

---

[3] Nina Pavcnik, *Do Pharmaceutical Prices Respond to Potential Patient Out-of-Pocket Expenses?*, RAND Journal of Economics Vol. 33, No. 3 (Autumn 2002), https://tinyurl.com/y5nhjto3.
[4] Choudhry, Niteesh K. *et al*., *Drug company-sponsored patient assistance programs: a viable safety net?*, Health Affairs (Project Hope), Vol. 28, No. 3 (2009), https://tinyurl.com/y33pp57k.
[5] David H. Howard, *Drug Companies' Patient-Assistance Programs—Helping Patients or Profits?*, New England Journal of Medicine (2014), https://tinyurl.com/y66kwwea.

convert such patients from nonusers to users. Programs must incur costs for patients who would have used the drug even in the absence of a program, but manufacturers can afford to pay a lot of $25 or $50 copayments in return for even a small increase in the sales of a $50,000 drug.

39. More recently, OIG has recognized that "the ability [of pharmaceutical manufacturers] to subsidize copayments for their own products may encourage manufacturers to increase prices" and hinder efforts to control costs for drugs because it would "largely insulate beneficiaries from price increases or high launch prices."[6]

40. OIG also recognized that cost-share waivers can result in anti-competitive and unfair market conditions. Specifically, it stated that cost-share waivers carry the risk of "steering beneficiaries to one product over another" and risk "penalizing a manufacturer that does not participate."[7]

41. Similarly, OIG concluded that cost-share waivers could dissuade prescribers from "prescribing a product for which a beneficiary would pay the full cost-sharing amount if a different, clinically appropriate drug" were included in a cost-share waiver program.[8]

42. Independent researchers have concluded that while cost-sharing obligations may sometimes present an obstacle to receiving medical treatment, the "'solution' offered in the form of manufacturer-supported patient assistance programs is likely to worsen the affordability of prescription drugs for the health care system overall."[9]

---

[6] OIG Advisory Opinion No. 22-19 at 16, 18 (Sept. 30, 2022), https://oig.hhs.gov/documents/advisory-opinions/1056/AO-22-19.pdf.
[7] *Id.* at 20-21.
[8] *Id.* at 20.
[9] Leemore Dafny, Christopher Ody, & Teresa Rokos, *Giving a Buck or Making a Buck? Donations by Pharmaceutical Manufacturers to Independent Patient Charities*, 41 Health Affairs 9, 16 (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00177.

43. For example, when Martin Shkreli's Turing Pharmaceuticals purchased the drug Daraprim, it simultaneously raised the price of the drug by 5,000 percent and began donating millions of dollars to a co-pay charity to ensure demand for the product would stay high.[10]

44. On average, "[p]rices of branded drugs with [cost-share waiver] coupons grow over 12 percent per year, while prices of branded drugs without coupons grow 7-8 percent per year."[11]

45. As a result, "patient assistance programs likely harm a range of stakeholders, including the patients the charities are ostensibly designed to help."[12]

46. In other words, by paying patient cost-share obligations, drug manufacturers can remove the downward price pressures on their drugs that the patients in a non-distorted market would otherwise apply. Managed care companies like United, employers who offer self-funded insurance, and the United States healthcare system as a whole, in turn, must foot the bill of those inflated costs.

### United's Administration of Medicare Part D Plans

47. United is a health services company that provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of benefit

---

[10] Wayne Duggan, *How Big Pharma Uses Charity Programs to Cover Drug Price Hikes*, Yahoo! Finance (May 20, 2016), https://finance.yahoo.com/news/big-pharma-uses-charity-programs-194652276.html.

[11] Leemore Dafny, Christopher Ody, & Matt Schmitt, *When Discounts Raise Costs: The Effect of Copay Coupons on Generic Utilization*, 9 American Economic Journal: Economic Policy 2, 27 (2017), https://www.hbs.edu/ris/Publication%20Files/DafnyOdySchmitt_CopayCoupons_32601e45-849b-4280-9992-2c3e03bc8cc4.pdf.

[12] Leemore Dafny, Christopher Ody, & Teresa Rokos, *Giving a Buck or Making a Buck? Donations by Pharmaceutical Manufacturers to Independent Patient Charities*, 41 Health Affairs 9, 16 (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00177.

plans and policies of insurance, including group and individual health benefit plans, employer-sponsored benefit plans, and government-sponsored benefit plans.

48. United aims to provide the individuals covered by the benefit plans it insures and administers with comprehensive healthcare coverage at affordable costs from well-qualified medical professionals at professionally staffed and accredited medical facilities.

49. In its capacity as an insurer and as a claims administrator, United processes millions of health care claims per day and is responsible for administering hundreds of millions of health care claims every year.

50. While United offers and administers a variety of different plans, Teva's misconduct here specifically targeted United's Medicare Part D plans, which United administers for Medicare beneficiaries.

51. The Medicare program has four "parts" through which health benefits are provided to eligible Americans. Medicare Part A covers inpatient hospital services, skilled nursing facility services, and some forms of home-based care. Medicare Part B covers physician services, outpatient hospital services, diagnostic services, and other medical services. Parts A and B together are the "original" Medicare programs that the United States government directly administers through the Centers for Medicare and Medicaid Services ("CMS").

52. Patients who are eligible for Part A and already enrolled in Part B have the option of choosing Medicare Part C, also called Medicare Advantage. Medicare Advantage plans combine the benefits of the two original Medicare parts and often include prescription drug coverage (Part D) as well. Private health insurers known as Medicare Advantage Organizations ("MAOs") provide these plans under contract with CMS.

12

53. In 2006, Medicare launched Part D, a voluntary prescription drug program for Medicare enrollees. CMS contracts with private health insurers known as Part D sponsors to provide Part D plans. Patients can enroll in a standalone Part D plan in addition to another Medicare plan, or they can enroll in a Medicare Advantage (Part C) plan that includes Part D coverage.

54. United issues and administers both standalone Part D plans and Medicare Advantage plans that include Part D.

55. Taxpayer dollars underwrite Medicare Part D plans. Premiums for Part D plans are divided between the insureds and Medicare funds paid by taxpayers.

56. Generally, Medicare beneficiaries are required to pay for a portion of the cost of insurance themselves; such cost-sharing obligations can come in the form of premiums, deductibles, co-pays, or co-insurance. Cost-sharing obligations for prescription drugs can amount to 5% to 100% of the total cost of the drug.

57. Part D sponsors like United enter into subcontracts with pharmacies and other downstream entities to provide drugs to Part D patients. The pharmacies then contract with pharmaceutical companies and drug distributors to acquire prescription drugs for Medicare insureds.

58. When a pharmacy dispenses drugs to a Part D patient, it submits a claim to the Part D plan sponsor such as United, which reimburses the pharmacy for a portion of the drug price not paid by the Part D beneficiary at the point of sale. The Part D sponsor then submits a record of the claim, known as a "Prescription Drug Event" ("PDE"), to CMS.

59. The PDE claims data includes information such as patient name, prescriber, drug name, and quantity. CMS pays Part D plan sponsors based on the PDE data. Submission of PDE data to CMS is an express condition of payment. In addition, Part D sponsors and "downstream" entities must certify that PDE data is true, accurate, and complete, and that it is the basis for obtaining federal reimbursement for the products reflected therein.

60. Claims are not payable under Medicare if they do not comply with all applicable federal laws. For example, compliance with the Anti-Kickback Statute, discussed below, is a condition of payment under Medicare.

61. Downstream entities that subcontract with Medicare Part D plans must comply with federal laws and regulations, including the False Claims Act (31 U.S.C. § 3729, et seq.) and Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) (section 1128B(b) of the Social Security Act).

62. The details of the Medicare Part D plans that United administers are set forth in a document titled "Evidence of Coverage." CMS mandates that insurers use approved language in their Medicare policy documents, including the Evidence of Coverage. CMS's approved language is publicly available, and United adopts those materials as issued by CMS for its own Evidence of Coverage documents.

63. An example of a United Evidence of Coverage written for a 2014 UnitedHealthcare Group Medicare Advantage (PPO) plan which incorporates Medicare's model language, is attached hereto as Exhibit 1.

64. The Evidence of Coverage explicitly states that "for most of your drugs covered by the plan, you *must pay your share of the cost* when you get the drug." Exhibit 1 at 140 (emphasis added).

65. The Evidence of Coverage also makes clear that, except for limited circumstances, cost-sharing obligations made by third-parties do not count toward a beneficiary's out-of-pocket costs. *Id*. at 104.

66. In this case, the cost-sharing payments made by CDF and TAF would not count toward a beneficiary's out-of-pocket costs because those payments were actually made by Teva and were not truly charitable.

67. In addition, the Evidence of Coverage states that when beneficiaries get their drugs through patient assistance programs offered by a drug manufacturer, United "will not pay for any share of these drug costs." *Id*. at 5.5.

**Legal Prohibitions on Pharmaceutical Companies Paying Patient Cost-Sharing**

68. Federal and state law prohibit pharmaceutical companies from paying the cost-sharing obligations of their customers.

69. Medicare Part C and D are "federal health care programs" as defined by 42 U.S.C. § 1320-7b(f), and therefore pharmaceutical companies like Teva that obtain reimbursement for their drugs through any Medicare Part C or D plan must comply with the Anti-Kickback Statute.

70. The federal Anti-Kickback Statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal healthcare program.

71. A pharmaceutical manufacturer's waiver or payment of the cost-sharing obligations of members—including through inappropriate charitable arrangements—constitutes a violation of the federal Anti-Kickback Statute whether the patient at issue is enrolled in a Medicare Part A, Part B, Part C, or Part D plan.

72. The federal government has issued numerous guidance documents (Bulletins) that explain what sorts of arrangements between pharmaceutical companies and charities violate the Anti-Kickback Statute.

73. In 2005, the Office of Inspector General ("OIG") issued a Bulletin[13] directed specifically to patient access programs ("PAPs") that provide charitable cost-sharing assistance. Issued just before the Medicare Part D program went into effect, OIG noted that patient access programs that were funded by pharmaceutical manufacturers and used to subsidize Part D cost-sharing amounts present heightened risks under the Anti-Kickback Statute. That Bulletin noted that in certain circumstances, cost-sharing subsidies provided by *bona fide*, independent charities unaffiliated with pharmaceutical manufacturers could be appropriate, even if the charities received manufacturer contributions but only so long as certain safeguards are met.

74. Specifically, OIG noted that "[f]or purposes of an anti-kickback analysis, we would not consider a charitable foundation (or similar entity) formed, funded, or controlled by a manufacturer or any of its affiliates, to be a *bona fide*, independent charity, because interposition of the entity would not sever the nexus between patient subsidies and the manufacturer. Indeed, in most cases, the foundation would receive all of its funding from the pharmaceutical manufacturer . . . and would provide subsidies only for the manufacturer's products."

75. OIG went on to explain, "where a manufacturer PAP offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing

---

[13] 70 Fed. Reg. 70623 (Nov. 22, 2005).

drugs; and reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs."

76. OIG also expressed concerns that the use of cost-sharing subsidies to shield beneficiaries from the economic effects of drug pricing would eliminate a market safeguard against inflated prices.

77. OIG provided a blueprint for a patient-assistance program that would comply with federal law. According to OIG, all of the following should be true for such a program to be compliant:

a.   The third-party administering the program is an independent, *bona fide*, charity;

b.   Neither the manufacturer nor any affiliate exerts any direct or indirect influence or control over the charity or program;

c.   Assistance is awarded in a truly independent manner that severs any link between the manufacturer's funding and the beneficiary;

d.   The charity awards assistance without regard to the beneficiary's choice of product, provider, practitioner, or supplier;

e.   Assistance is based on a reasonable, verifiable, and uniform measure of financial need applied in a consistent manner;

f.   The manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products; and

g.   The manufacturer does not earmark its donations for narrow disease categories (or for use of a specific drug) which, for example, are defined by reference to specific symptoms, severity of symptoms, or method of administration of drugs. Manufacturers should limit their

17

earmarked donations to PAPs that define categories in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products.

78. In 2014, OIG issued a Supplemental Bulletin on pharmaceutical companies' "indirect remuneration to patients" through "contributions to PAP[s]" operated by independent charities.[14] In that Supplemental Bulletin, OIG reiterated that "[i]f a donation is made to a PAP to induce the PAP to . . . arrange for the purchase of the donor's federally reimbursable items, the [federal Anti-Kickback] statute could be violated."

79. In the Supplemental Bulletin, OIG also emphasized that independent charities cannot "give a donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP."

80. The federal Anti-Kickback Statute is supplemented by a number of state laws that prohibit the same type of conduct. States with similar prohibitions include Texas, Florida, Illinois, California, Minnesota, and others. Many of these state statutes prohibit causing the submission of claims tainted by kickbacks to insurers even outside of the context of a governmental health insurance program.

81. In addition to the Anti-Kickback Statute, the False Claims Act (31 U.S.C. § 3729) prohibits knowingly causing the submission of fraudulent claims for payment to a federal health program like Medicare.

82. Pursuant to 31 U.S.C. § 3729(a), claims for reimbursement to the Medicare program that result in violation of the federal Anti-Kickback Statute constitute *per se* violations of the False Claims Act.

---

[14] 79 Fed. Reg. 31120-31123 (May 30, 2014).

## **TEVA'S FRAUDULENT SCHEME**

83. Beginning in 2006, Teva embarked on a fraudulent scheme designed to deceive United and subvert the cost-sharing obligations set out in the contracts discussed above.

84. Specifically, Teva conspired with CDF, TAF, ACS, and AssistRX to make and conceal illegal payments to patients taking Copaxone to skirt their cost-sharing obligations and inflate the price of the drug.

85. In doing so, Teva reaped billions of dollars in ill-gotten profits.

86. Documents unearthed by the Department of Justice, discussed below, provide a detailed look into the inception and execution of Teva's scheme. And settlements by CDF, TAF, ACS, and AssistRX confirm the scheme.

### **Teva Enters into a Conspiracy Involving CDF, TAF, ACS, and AssistRX**

87. Teva laid the groundwork for its scheme with its Shared Solutions program, through which it offered a suite of services designed to get and keep patients on Copaxone. Teva advertised the program to physicians, and they enrolled their patients by submitting applications to Teva. This ultimately gave Teva a direct line to the large majority of Copaxone patients.

88. One of the services Teva offered through the Shared Solutions program was help obtaining financial assistance for patients who could not afford the substantial cost-sharing obligations associated with Copaxone. From the outset, Teva set a relatively high price for the drug (roughly $17,000 annually) that presented a financial barrier to many. Teva's training materials for its sales team explained that the Shared Solutions program was meant to ensure "financial concerns" would not deter patients from taking the drug and that doctors would not balk at prescribing it "based on cost."

19

- **Shared Solutions**® is committed to helping ensure that financial concerns do not come between patients and their treatment
- No patient should have to choose, interrupt, or discontinue therapy because of financial concerns, nor should a health care provider have to make clinical decisions based on cost
- **Shared Solutions**® is dedicated to finding the right assistance for both new and existing patients

89. In October 2006, Teva entered into a contract with ACS, a pharmacy founded by Edward Hensley and Jeff Spafford. Under the contract, Shared Solutions would refer Copaxone patients who had or were eligible for Medicare Part D to ACS. ACS would dispense Copaxone to those patients, help patients who did not have Medicare Part D apply for coverage, and help patients with Medicare Part D apply for financial assistance from patient charities. Teva paid ACS service fees for performing its various duties under the contract.

90. ACS not only helped patients apply for cost-sharing assistance from patient charities, but it also carefully tracked the patients seeking and receiving funding from patient charities. ACS regularly provided a detailed accounting of this information to Teva from the inception of their relationship in 2006 through 2015.

91. As explained in sworn testimony Hensley provided to the DOJ, Teva made clear that its patients should be directed only to certain patient charities—specifically, those that Teva could use as a "pass-through vehicle" to Copaxone patients. Ex. 2. For example, Denise Lynch, who served first as Teva's Director of Customer Resources and later as its Vice President of Patient Services, explained to Hensley that Teva would not work with Patient Services, Inc. (a patient charity like CDF and TAF) because it had "burned" Teva, allocating funds donated by Teva to non-Copaxone MS patients. *Id*. Teva viewed this as other pharmaceutical manufacturers "riding on [Teva's] coattails." ACS thus was directed that Teva's funds should "go to [its] own drug," as that was "the intent of the project." Ex. 3.

92. Teva found a patient charity willing to act as a "pass-through vehicle" in CDF. CDF provides grants to patients to cover cost-sharing obligations associated with expensive drugs. Grants are drawn from discrete funds dedicated to specific health conditions, such as MS, for specific treatments. CDF allocated money to patients on a first-come-first-serve basis in an amount calculated to cover the patient's cost-sharing obligations for their drug over the coming year. Once the fund for a condition was depleted, the fund closed, and cost-sharing assistance from CDF was no longer available for that condition until CDF received additional donations.

93. From 2006 through 2014, Teva made 20 donations to CDF totaling more than $94 million on the dates and in the amounts listed in Exhibit 4. CDF retained a portion of these donations, typically 9%, as an "administrative fee."

94. Although CDF's MS fund provided Medicare cost-sharing assistance to patients using a variety of MS drugs, Teva, CDF, and ACS ensured that Teva's payments would be used only for Copaxone patients, as detailed further below. Ex. 2.

95. The conspiracy ultimately expanded to include AssistRX and TAF. In 2008, Hensley and Spafford sold ACS. The following year, they founded AssistRX that also contracted with Teva. Beginning in 2010, AssistRX began running a free drug program, "Copaxone Cares," for uninsured and underinsured Copaxone patients. When AssistRX identified patients eligible for Medicare, it helped enroll them and referred them for "charitable" funding. In 2015, AssistRX assumed all of the same duties that ACS had fulfilled with respect to arranging "charitable" funding for Copaxone patients.

96. The Copaxone Care program provided free drugs to some patients but was closed to any Medicare patients eligible for "charitable" funding. The one exception to the policy was Copaxone patients who began taking the drug toward the end of the year, when "charitable"

funding was typically not immediately available but soon would be. In such cases, AssistRX would temporarily enroll these patients in the Copaxone Cares free drug program and "transition [them] to CDF Med D program" at the start of the next year, as explained in an email from Hensley. Ex. 5. As noted in an internal Teva email from a Shared Solutions manager, the purpose of this policy was to "tee [patients] up for Foundation Assistance for the following January when funds [would] be available." Ex. 6.

97.  Around the same time Hensley and Spafford founded AssistRX, they also founded TAF, a patient charity that operated in much the same manner as CDF. In January 2010, TAF opened an MS fund. Hensley assured Lynch around that time that TAF "would provide all of the advantages that CDF did." He thus "made sure that Ms. Lynch understood that Teva effectively would be able to use TAF as it had CDF: essentially, as a 'pass-through' donation vehicle to get Teva monies into the hands of Copaxone patients." Ex. 2, Para 10.

98.  TAF gradually became the primary charity through which the conspiracy operated. Between December 2010 and December 2015, Teva "donated" $234.4 million to TAF on the dates and in the amounts listed in Exhibit 4. TAF retained a portion of these donations, typically 9%, as an "administrative fee."

99.  As they had with CDF donations, Teva, ACS, AssistRX, and TAF worked together to ensure that Teva's "donations" to TAF were routed to Copaxone patients.

**The Conspiracy Makes and Conceals Illegal Payments to Copaxone Patients**

100. The conspiracy's scheme relied on Teva making "donations" to CDF and TAF tailored to the amounts CDF and TAF spent on Copaxone patients' cost-sharing obligations, which CDF and TAF would then route to Copaxone patients. Teva made these "donations" in two ways. First, Teva made contributions to CDF and TAF at the end of every year in an amount

calculated to cover CDF's and TAF's spending for the next year on current Copaxone patients' cost-sharing obligations. Second, Teva made contributions to CDF and TAF throughout the year to cover the cost-sharing obligations of new Copaxone patients.

101. To calculate its end-of-year contribution to each fund, Teva needed to determine the number of Copaxone patients receiving "charitable" assistance from CDF and TAF and how much money each fund would spend per patient.

102. From 2006 to 2015, ACS provided Teva with detailed information regarding the number of patients seeking and receiving cost-sharing assistance from CDF and TAF. After 2015, AssistRX provided Teva with this same information.

103. Because ACS both dispensed Copaxone and helped patients apply for funding from CDF and TAF, it had a unique window into this information. But ACS also asked for and received information regarding the numbers of patients receiving cost-sharing assistance from CDF and TAF from the charities themselves. ACS regularly passed this information on to Teva via phone or email.

104. For example, on December 23, 2008, ACS sent Teva an email indicating that 2,499 Copaxone patients were currently receiving funding from CDF. Ex. 7. On December 30, 2009, ACS sent another such email to Teva, notifying it that 3,230 Copaxone patients were receiving cost-sharing assistance from CDF. Ex. 8. On December 14, 2010, ACS informed Teva via email that 2,008 Copaxone patients were receiving cost-sharing assistance from CDF, while 2,714 more were receiving cost-sharing assistance from TAF. Ex. 9. And on December 5, 2013, ACS sent Teva an email reflecting that 5,614 Copaxone patients were receiving cost-sharing assistance from TAF, while 1,188 were receiving cost-sharing assistance from CDF. Ex. 10.

105. In addition to information regarding the number of patients seeking and receiving charitable funding provided by ACS, Teva regularly obtained information regarding the amount per-patient CDF and TAF paid for Copaxone treatment from the charities themselves. CDF and TAF similarly advised Teva as to the percentage of donations they would retain for themselves as an administrative fee (typically 9%), and counseled Teva as to how to use that information to calculate Teva's "donations."

106. For example, CDF's President Michael Banigan sent an email to Lynch on October 28, 2010 stating: "We are estimating the per-patient grant amount of $3,950 next year. Math is simple. Number of patients time the grant amount divided by .91. We can chat at your convenience." Ex. 11. The ".91" figure accounted for CDF's 9% administrative fee. Similarly, in an email exchange dated November 7, 2012, Clorinda Walley (CDF's Executive Director) and Banigan informed Lynch that the "2012 per patient allocation" was $4,750, and that "[a]dmin is 9%, but in reality [CDF] paid out 92%." Ex. 12. And in another email dated December 20, 2013, Walley informed Lynch that the "[i]nitial allocation" for Copaxone patients would be $5,000. Ex. 13.

107. Hensley provided the DOJ with sworn testimony that, after TAF began accepting payments from Teva, he "regularly provide[d]" similar information to Teva, including "the 'per-patient allocation[] that TAF was using" for Copaxone patients. He sometimes did so on his own initiative, but did so "usually . . . in response to a specific request by Ms. Lynch." Ex. 2, Para. 13. In one representative email dated September 27, 2011, Henley informed Teva that TAF's "allocation per patient for 2012" would be $4,600. Ex. 14.

108. With this information in hand, Teva would multiply (1) the number of Copaxone patients the fund would assist in the following year by (2) the amount of money the fund had

allocated to each of those patients. Teva would then add a 9% administrative fee to reach its total end-of-year contribution amount for the fund.

109. Teva would pay these sums, as reflected in Exhibit 4, to CDF and TAF on the understanding that CDF and TAF would use Teva's "donations" to pay the cost-sharing obligations of current Copaxone patients. Teva then obtained confirmation that CDF and TAF had done so through ACS.

110. In addition to its end-of-year contributions to CDF and TAF, Teva also made contributions throughout the year targeted to eliminate the cost-sharing obligations of new Copaxone patients. As with its end-of-year contributions, Teva collaborated with ACS and AssistRX to ensure that its contributions to CDF and TAF would cover only the cost-sharing obligations of Copaxone patients and would be routed by CDF and TAF to those patients.

111. After CDF and TAF allocated all of their funds earmarked for MS patients, the funds would close and the charities would not accept additional patients until they received additional donations. Once this happened, ACS would provide Teva with detailed information regarding the number of Medicare patients waiting to fill their Copaxone prescriptions until cost-sharing assistance became available.

112. When there were a sufficient number of patients waiting for funding, Teva would calculate (with assistance from ACS, CDF, and TAF) how much money it needed to donate to CDF or TAF to cover the cost-sharing obligations of those patients. Similar to its end-of-year calculation, Teva would multiply the number of patients by the per-patient allocation, and add 9% to reach a total donation amount.

113. Teva would inform ACS how much, to which fund, and when it planned to make its "donation." ACS would then transmit the new Copaxone patients' applications for cost-sharing

assistance to the relevant foundation as soon as Teva had made its payment—sometimes within a matter of minutes.

114. CDF and TAF, unlike other charitable foundations, allowed new applications for co-pay assistance to be submitted in a "batch" rather than one at a time. Moreover, because CDF and TAF allocated funds on a first-come-first-served basis, the Copaxone patients for whom ACS submitted batched applications  would immediately exhaust the new funds "donated" by Teva. In effect, CDF and TAF would immediately and predictably route Teva's "donations" directly to Copaxone patients.

115. As one example of how the scheme worked, on September 19, 2012, Lynch sent Hensley an email stating that she "[n]eed[ed] to talk to [him] about another donation." Shortly thereafter, Hensley forwarded Lynch's email to his colleagues at TAF (from his email account at AssistRX), asking "[w]hat number should [he] give [Lynch]" for "a couple hundred patients" for funding "till [sic] the end of the year." Hensley's TAF colleague responded with the per-patient allocation amount for Copaxone, and stated "[i]f it was for 200 new patients, the total ask will need to be $703,500.00 (which includes the 9% admin fee)." Ex. 15. The following day, ACS sent Teva an email confirming that "[t]he up to the minute number [was] 197" for patients awaiting foundation funding for Copaxone. Ex. 16. On September 21, 2012, Teva made a "donation" in an amount ($700,000) tailored to cover the cost-sharing obligations of these patients. Ex. 4. ACS then submitted applications for funding to TAF for all of its waiting Copaxone patients, and on September 26, 2012, TAF confirmed via email to Hensley that it had "processed 202 new Copaxone patients from the … referral file." Ex. 17.

116. Similarly, on February 9, 2011, ACS informed Teva via email that 320 patients awaited foundation funding for Copaxone. Ex. 18. The following day, Lynch sought and

received approval to make a donation to TAF in an amount ($1.5 million) tailored to cover the cost-sharing obligations of these 320 patients, plus TAF's 9% administrative fee. Ex. 19. On February 11, 2011, Teva made the $1.5 million donation to TAF. Ex. 4.

117. Again, on June 30, 2011, ACS informed Teva that there were 100 Copaxone patients awaiting foundation funding, and that with the expected referral of additional patients in the near future, there would be a need to fund "around 200" Copaxone patients. Ex. 20. Later that day, Teva made a donation of $1 million, an amount tailored to cover the cost-sharing obligations of these 200 patients. Ex. 4. On July 5, 2011, ACS confirmed internally that it had "[s]ecured additional funding for up to 200 patients" for Teva. Ex. 21.

118. Teva deliberately routed all of the payments discussed above to Copaxone patients. CDF and TAF understood that they facilitated these targeted payments by Teva to Copaxone patients. ACS (and eventually AssistRX) likewise understood that the purpose of the foregoing conduct was to permit Teva to make targeted payments to Copaxone patients.

119. The payments discussed above were intended first and foremost to enrich Teva and its co-conspirators. Indeed, in a July 2013 memorandum, Teva's tax department concluded that Teva's contributions to CDF and TAF should be categorized "as a business expense instead of charitable contribution," reasoning that Teva's payments to CDF and TAF were "made with the expectation of financial return commensurate with the amount donated." Ex. 22.

120. Teva recognized that the donations discussed above were vital to its bottom line and that if it reduced or failed to make these payments, its profits would suffer because patients would be unable to afford the cost-sharing obligations associated with Copaxone. For example:

a.  In December 2011, internal Teva emails show that Teva executives rejected a proposal to cut a donation to TAF by $5 million because doing so would have "a direct and immediate impact on units [sold]" of Copaxone. Ex. 23.

b.  In December 2012, a Teva marketing director told his boss that he had directed Lynch to contribute about $15 million more in 2013 than planned, because "not doing so directly impacts the topline with existing patients." Ex. 24.

c.  In February 2015, a Teva financial analyst informed Teva's Vice President of Finance that Teva needed to contribute $5 to $8 million more to CDF and TAF in order to avoid losing approximately 1,500 Medicare patients and as much $5.8 million per month in net sales. Ex. 25. As a result, Teva paid TAF $8.5 million, increasing rather than making planned cuts to its "donation."

d.  In August 2015, a Teva employee told Teva's finance manager that if Teva reduced its financial support of TAF by $10 million, "the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill." The finance manager responded that Teva needed to "either pay it and go over budget or we don't make our sales numbers." Ex. 26.

121. In order to avoid leaving a paper trail of its illegal activities, Teva instituted an unwritten policy against conducting formal return-on-investment analyses. Jenny Jackson, a Teva Patient Services manager, testified to the DOJ that the policy was "widely known" at Teva. But Teva executives and employees did perform some informal analyses of the impact of the scheme on Teva's bottom line despite the policy. For example:

a. According to Jackson's handwritten notes from a January 2010 meeting, Teva calculated that paying $28 million to CDF and TAF would support over 4,800 Copaxone patients, and generate over $114 million in net revenue:



b. In 2008, Teva calculated that it would spend $97 million on contributions to co-pay assistance funds between 2008 and 2011, and that its contributions would result in the sale of an additional $300 million worth of Copaxone.

c. Likewise, a 2011 presentation stated that Teva's contributions to CDF and TAF had an average return on investment of 451%.

122. Meanwhile, Teva continued to raise the price of Copaxone. From late 2006 to 2015, Teva raised the price from approximately $17,000 to over $73,000 per year.

123. Doctors generally will not prescribe drugs that they know their patients cannot afford. Similarly, patients will not—indeed, *cannot*—buy drugs for which they are unable to pay. In fact, a recent survey found that 27% of respondent patients had at one time declined to fill a prescription due to cost.[15]

124. Teva well understood that, due to patient cost-sharing obligations, it could not sell Copaxone to an appreciable number of patients at the high prices it set for the drug. And Teva repeatedly recognized that, absent the scheme described above, it would lose Copaxone sales.

125. Teva thus induced doctors to prescribe Copaxone, and patients to purchase it, by means of the scheme discussed above.

126. Teva did so not just by eliminating the cost-sharing obligations of Copaxone patients but also by publicizing the availability of "charitable" funding to doctors and patients through the Shared Solutions program.

127. In doing so, Teva ensured that any "financial concerns" raised by cost-sharing obligations would not deter patients from taking Copaxone and that doctors would not balk at prescribing it "based on cost." Had Teva not engaged in the conduct described above, it would not have been able to sell its drug to the vast majority of Copaxone patients, nor would it have reaped the financial windfall it enjoyed at the expense of managed care companies  like United.

---

[15] Patient Engagement HIT, *Healthcare Costs Dampen Patient Engagement Despite Satisfaction* (May 19, 2016), https://tinyurl.com/6mm54r9x.

**Teva Actively Conceals the Scheme**

128. The purpose and effect of the scheme described above was to obscure the fact that Teva paid the cost-sharing obligations of Copaxone patients. By secretly coordinating with ACS, AssistRX, CDF, and TAF, Teva was able to create and foster the false impression among insurers, the federal government, doctors, and patients that Copaxone patients insured by Medicare were merely receiving "charitable" funding from an independent foundation in compliance with federal law.

129. Teva further adopted internal policies aimed at suppressing the true nature of its scheme with ACS, AssistRX, CDF, and TAF. In particular, Teva adopted a policy that there should be no formal written record of its return-on-investment analyses of its donations to CDF and TAF, even as Teva conducted such analyses clandestinely.

130. On information and belief, Teva took further measures to actively conceal the scheme that are known only to Teva, ACS, AssistRX, CDF, and TAF.

131. Teva and its co-conspirators concealed their actions and suppressed knowledge of the true nature of the enterprise because they understood Teva's payments to Copaxone patients to be illegal and to violate the terms of insurance contracts like those United has with its members.

132. Lynch and Teva's other employees and officers were familiar with the Anti-Kickback Statute, the OIG's 2005 Bulletin, and the OIG's 2014 Supplemental Bulletin, discussed above in paragraphs 68-79. Teva's relevant executives received training regarding the OIG's Anti-Kickback Statute guidance and regularly communicated internally and with Teva's co-conspirators (including Hensley) regarding those legal restrictions.

31

133. More specifically, Teva knew that federal law did not permit Teva to cover the cost-sharing obligations of Copaxone patients by using a foundation as a conduit. Indeed, after she retired from Teva, Lynch told Hensley that she had warned Teva's senior leadership that Teva should "take a reserve" to cover liabilities that might arise from its payments to CDF and TAF.

134. Teva understood not only that the conduct was illegal and tortious, but that its actions tainted any resulting claims for Copaxone with illegal kickbacks. As such, those claims would not be payable under Medicare plans like those United sponsors. Teva knew that United and other payors would not pay claims for Copaxone if they understood those claims to be tainted by an illegal kickback scheme.

135. Teva further understood that eliminating the cost-sharing obligations of Copaxone patients caused them to violate the terms of their insurance contracts, including their contracts with United. Teva knew that United and other payors would not pay claims for Copaxone if they understood that Teva had covertly paid their insureds' cost-sharing obligations.

136. By concealing the scheme, Teva deceived United into paying claims under its Medicare Part C plans for Copaxone. Had United known that the claims for Copaxone were tainted by the scheme described above, it would not have paid them.

137. Moreover, Teva's scheme permitted Teva to charge United far higher prices for Copaxone than Teva could have charged absent the scheme.

**The Conspirators (and Teva in Particular) Reap Windfall Profits from the Scheme**

138. Teva's scheme worked precisely as planned. Teva maintained an artificially high price for Copaxone and reaped windfall profits for years.

139. Since 2006, sales of Copaxone have generated more than $30 billion in revenue for Teva. These profits would not have been possible absent the scheme described above.

140. In 2009, Teva stated in its Form 20-F report to the Securities and Exchange Commission ("SEC") that Copaxone was its "largest drug" and was responsible for "approximately 18% of [Teva's] net sales" but "contribute[d] disproportionately to [Teva's] profits."

141. Teva reported that its income in North America grew over the prior year by 34%. Teva attributed its financial success in significant part to "[c]ontinued growth in sales of Copaxone," noting that it had achieved "record in-market sales of Copaxone in the U.S."

142. Teva explained that "[g]rowth in U.S. sales of Copaxone was driven by price increases in January and April and to a lesser extent by increases in unit sales, whereas the increase in sales outside the U.S. was driven primarily by unit growth." The two increases in the United States raised the already expensive drug's price by 12.5% and 9.9% respectively.

143. Over time, Teva continued to increase Copaxone's price and to depend on its windfall profits from the drug.

144. Teva warned in its 2015 Form 20-F report to the SEC that it "relie[d] heavily on sales of COPAXONE, its leading specialty medicine." It explained further that "Copaxone accounted for $4.0 billion (including $3.2 billion in the U.S.), or 20% of [its] revenues in 2015, and contributed a significantly higher percentage to [Teva's] profits and cash flow from operations during such period." By that point, Teva's gross profit margin for Copaxone sales exceeded *86%* as a result of the unlawful scheme.

145. Teva further explained that "[a]ny substantial decrease in the revenues derived from [its] specialty medicines," and especially Copaxone, "would have an adverse effect on [its] results of operations."

146. The foregoing gave Teva a strong motive to perpetuate and hide its illegal relationship with CDF and TAF to protect its bottom line. Teva's motive to perpetuate its scheme only grew in the years following that scheme's inception.

### The United States Investigates Teva's Scheme and Brings Suit

147. Despite its best efforts, Teva could not keep its illegal relationship with the CDF and TAF a secret forever.

148. In 2014, the Department of Justice began scrutinizing the relationships between pharmaceutical companies and purportedly independent charities. This has resulted in the federal government recovering hundreds of millions of dollars in connection with schemes just like that described above.

149. For example, in 2017, the Department of Justice announced that United Therapeutics Corporation "agreed to pay $210 million to resolve claims that it used a foundation as a conduit to pay the copays of Medicare patients taking UT's pulmonary arterial hypertension drugs." Among other things, the Department of Justice found that United Therapeutics "routinely obtained data from the foundation detailing how much the foundation had spent for patients on each Subject Drug and that this data was used by UT to decide how much to donate to the foundation."[16]

150. Again, in 2018, the Department of Justice announced that Actelion Pharmaceuticals US, Inc. had agreed to pay $360 million "to resolve claims that it illegally used a foundation as a conduit to pay the copays of thousands of Medicare patients taking Actelion's pulmonary arterial hypertension drugs." The Department of Justice found that Actelion "routinely obtained data

---

[16] Department of Justice, *Drug Maker United Therapeutics Agrees to Pay $210 Million to Resolve False Claims Act Liability for Paying Kickbacks* (Dec. 20, 2017), https://tinyurl.com/y7xsl95y.

from the foundation detailing how much the foundation had spent for patients on each Subject Drug; it then used this information to decide how much to donate to the foundation and to confirm that its contributions were sufficient to cover the copays of only patients taking the Subject Drugs."[17]

151. Indeed, in 2019, the Department of Justice announced that the CDF itself had "agreed to pay $2 million . . . to resolve allegations that [it] violated the False Claims Act by enabling pharmaceutical companies to pay kickbacks to Medicare patients taking the companies' drugs." In particular, the Department of Justice determined that the CDF had "provided [a pharmaceutical company] with information concerning the number of [its] patients receiving money from CDF's . . . fund," which "made it possible for [the pharmaceutical company] to confirm that CDF was using [its] money primarily to cover co-pays for [its drug], even though other [competing] drugs were on the market."[18]

152. Later that year, the Department of Justice announced that TAF had also "agreed to pay $4 million to resolve allegations that it violated the False Claims Act by enabling certain pharmaceutical companies to pay kickbacks to Medicare patients taking the companies' drugs." Specifically, the Department of Justice stated that TAF "functioned as a conduit for money from [pharmaceutical companies] to patients taking their MS drugs."[19]

---

[17] Department of Justice, *Drug Maker Actelion Agrees to Pay $360 Million to Resolve False Claims Act Liability for Paying Kickbacks* (Dec. 6, 2018), https://tinyurl.com/y67zsuj9.
[18] Department of Justice, *Foundations Resolve Allegations of Enabling Pharmaceutical Companies to Pay Kickbacks to Medicare Patients* (Oct. 25, 2019), https://tinyurl.com/y4hjrb7x.
[19] Department of Justice, *Third Foundation Resolves Allegations that it Conspired with Pharmaceutical Companies to Pay Kickbacks to Medicare Patients* (Nov. 20, 2019), https://www.justice.gov/usao-ma/pr/third-foundation-resolves-allegations-it-conspired-pharmaceutical-companies-pay-kickbacks.

153. And in 2020, the Department of Justice announced that it had reached a $3.5 million settlement with ACS to resolve allegations that it "conspired with pharmaceutical manufacturer Teva Neuroscience, Inc. (Teva), to enable Teva to pay kickbacks to Medicare patients taking Copaxone, a Teva drug approved for treatment of multiple sclerosis."[20]

154. The Department of Justice's efforts to investigate the scheme carried out by Teva ultimately culminated in a lawsuit filed by the United States Attorney's Office for the District of Massachusetts against Teva on August 18, 2020. *See United States v. Teva Pharmaceuticals USA, Inc.*, Case No. 20-cv-11548 (D. Mass).

155. The United States' complaint includes detailed allegations and dozens of exhibits that shed light on Teva's covert and illegal scheme. Before the filing of that complaint by the federal government, Teva successfully concealed its scheme from United and the public at large.

### United Was Damaged by Teva's Scheme

156. Between 2010-2015, United paid more than $100 million, out of its own pocket, for Copaxone on behalf of Medicare beneficiaries enrolled in United plans. The foregoing figure represents what United paid without reimbursement by the federal government.

157. Given the extraordinarily high cost of Copaxone, most United members were unable to pay their cost-sharing obligations for the drug.

158. On information and belief, most or all of the claims United paid for Copaxone were not payable because they were tainted by Teva's illegal and secretive kickback scheme.

---

[20] Department of Justice, *Specialty Pharmacy Advanced Care Scripts Agrees to Pay $3.5 Million to Resolve Allegations that it Served as a Kickback Conduit* (Aug. 13, 2020), https://www.justice.gov/usao-ma/pr/specialty-pharmacy-advanced-care-scripts-agrees-pay-35-million-resolve-allegations-it.

159. United is entitled to damages totaling the amount of all reimbursements where Teva, either through the CDF, TAF, or another third party, paid United member cost-sharing amounts in the service of its illegal scheme.

160. Because of the secretive nature of Teva's arrangement with CDF and TAF, which was not made public until August of 2020, United does not yet know the full scope of the damage caused by Teva's illegal and tortious conduct.

## TOLLING

161. To the extent any limitations periods might apply to claims United has against Teva, those limitations periods have not run because Teva has engaged in continuing, repetitive, tortious conduct, causing additional and ongoing injury to United. Because Teva's repetitive tortious conduct has not ceased, no limitations periods on United's claims have started to run.

162. Moreover, even if one or more limitations periods could apply, they would be tolled by virtue of the discovery rule. Teva concealed the central components of its scheme, making it difficult to discover. Indeed, the very purpose of Teva using the CDF and TAF as a conduit through which to pay the cost-sharing obligations of patients taking Copaxone was to conceal Teva's unlawful kickbacks. United only learned of this conduct on or about August 18, 2020 when the Department of Justice filed suit against Teva.

## COUNT I: FRAUDULENT CONCEALMENT AND FRAUD

163. United incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

164. Teva knew that United ultimately paid for Copaxone, and that its sales were dependent upon reimbursement by insurers like United.

165. Teva had superior knowledge of facts unavailable to United that Teva knew to be material to United's decision to reimburse for Copaxone. Specifically:

    a. Teva received information from CDF, TAF, and ACS regarding the amounts needed to cover the cost-sharing obligations of Copaxone patients, to the exclusion of patients using competing drugs;

    b. Teva illegally used this information to calibrate its "donations" to CDF and TAF to cover only the cost-sharing obligations of Copaxone patients;

    c. Teva, CDF, TAF, and ACS coordinated to ensure that Teva's donations were ultimately routed to Copaxone patients, and that the CDF's and TAF's outlay on Copaxone would have a one-to-one correlation with Teva's "donations" on at least an annual basis;

    d. As a result, CDF and TAF were not acting as independent, *bona fide* charities, but rather as illegal conduits for Teva to systematically eliminate the cost-sharing obligations of Copaxone patients enrolled in United's Medicare plans;

    e. The effect of Teva's scheme was effectively Teva's covert waiver of the cost-sharing obligations of most or all Copaxone patients;

38

    f.   By eliminating the cost-sharing obligations of Copaxone patients through its unlawful relationship with CDF and TAF, Teva was able to vastly inflate the price of Copaxone;

    g.   Teva deliberately used its illegal kickback arrangement with CDF and TAF to induce physicians to prescribe Copaxone, and patients to use it; and

    h.   In the absence of this illegal arrangement, Copaxone patients would instead have either received treatment using less expensive MS drugs, or Teva would have been forced to substantially lower the price of Copaxone in order to compete with cheaper MS drugs.

166. United was unaware of any of the foregoing facts.

167. The foregoing facts were material to United's decision to reimburse claims for Copaxone under its Medicare plans. Indeed, the above-described facts rendered claims for Copaxone submitted to United's Medicare plans not payable under federal law. Had United understood any of the foregoing, it would have refused to reimburse claims for Copaxone tainted by Teva's unlawful scheme under its Medicare plans.

168. Teva knew that United lacked knowledge of the above facts, and that United would not reimburse for Copaxone if it learned any of the above facts.

169. Teva further understood that pharmacies and other "downstream" entities submitting claims to United's Medicare plans for Copaxone, whose patients had received funds Teva illegally funneled through CDF and TAF, would certify that the claims were not tainted by illegal kickbacks.

170. Teva knew that its relationship with CDF and TAF violated the federal Anti-Kickback Statute, rendering those certifications false.

39

171. Teva further knew that United lacked knowledge of the falsity of these certifications, and that United would rely on them in reimbursing for Copaxone.

172. Teva's superior knowledge related to United's reimbursements for Copaxone, which payments Teva closely monitored and facilitated, and upon which Teva's business depended, gave rise to a duty on Teva's part to disclose the facts discussed above. Teva's active concealment of its illegal conduct with the intent to deceive United also independently gave rise to a duty to disclose the facts discussed above.

173. Teva did not disclose any of the foregoing material facts.

174. Despite regularly contacting United to monitor and facilitate payment of Copaxone claims, Teva withheld the above facts in order to deceive United into paying Copaxone claims tainted by kickbacks under its Medicare plans.

175. Indeed, rather than disclose these facts, Teva took active steps to hide them.

176. Teva knew that by concealing its scheme, it would deceive United into reimbursing claims for Copaxone that United would not otherwise pay.

177. United had no reason to believe that Teva and CDF and TAF were engaged in an illegal kickback scheme and that the claims United received for Copaxone to its Medicare plans were tainted by illegal kickbacks.

178. As a result of Teva's fraudulent concealment, United was damaged by paying hundreds of millions of dollars—if not more—on claims for Copaxone treatment that should not have been paid under its Medicare plans.

179. Teva intended these misrepresentations to deceive payors (including United), physicians, and patients as to the nature of Teva's relationship with CDF and TAF.

180. Teva understood that if payors (including United) learned the true nature of Teva's relationship with CDF and TAF, they would not reimburse for Copaxone claims from their Medicare plans.

181. Teva intended that United and other administrators of Medicare Part D plans would rely on these false statements when making reimbursements.

182. United justifiably relied on Teva's misrepresentations.

183. Teva directly and proximately caused significant damages to United in the form of payments United made for Copaxone from its Medicare plans, subsequent to and because of Teva's false representations.

184. On information and belief, the illegal kickback scheme between Teva and CDF and TAF tainted all or most of the claims submitted to United's Medicare plans for Copaxone from 2006 to the present day.

185. By virtue of the foregoing, United is entitled to compensatory and punitive damages that it suffered because of Teva's conduct in an amount to be determined at trial.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT

186. United incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

187. United members are parties to United benefit plans, which are contracts between the members and United.

188. As is described in detail above, United's benefit plans, including its Medicare Part D plans, require United *members*—not others paying on their behalf—to pay the cost-sharing obligations set forth in the plans when obtaining prescription drugs, including Copaxone.

189. United's Medicare Part D plans state, for example, that "as a plan member, *you* are responsible" for making coinsurance payments and that "for most of your medical services or drugs covered by the plan, *you* must pay your share of the cost when you get the service or drug." Ex. 1 at 206 (emphasis added).

190. Teva knew that United members were parties to United's Medicare Part D benefit plans and that the plans required the members to pay cost-sharing obligations. Such requirements are standard features of Medicare insurance plans, which stand as barriers between Teva and its goals of maintaining and increasing the prices and utilization of Copaxone.

191. Despite that knowledge, Teva intentionally interfered with those plan requirements by paying for and eliminating United members' cost-sharing obligations, in a deliberate effort to subvert the benefit United anticipated from those contractual provisions, by using CDF and TAF as conduits to make the payments and conceal Teva as the source of the funds.

192. As a result, United's members never made any coinsurance payment themselves, as they were required to do under the terms of their contracts.

193. Teva's interference caused United members to breach their agreements with United when they failed to pay the cost-sharing obligations set forth in their insurance plans.

194. Teva's interference and procurement of those contractual breaches was wrongful and without justification, and intended to defeat the structure of United's managed-care system and to benefit Teva financially at United's expense.

195. The contractual breaches Teva caused have directly and proximately caused significant damages to United in the form of payments United made for Copaxone, subsequent to and because of those breaches, which were not due and would not otherwise have been made.

196. By virtue of the foregoing, United is entitled to compensatory and punitive damages, interest and costs, an injunction prohibiting Teva from continuing to engage in the tortious conduct described above, and any other relief deemed just and proper.

<u>**COUNT III**</u>**: AIDING AND ABETTING TORTIOUS CONDUCT**

197. United incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

198. To the extent Teva did not directly implement the scheme described above, it provided substantial aid and encouragement to CDF and TAF, which also committed torts against United by interfering with United's contractual agreements with its members and fraudulently concealing Teva's scheme.

199. As is described in detail above, United's benefit plans require United members to pay the cost-sharing obligations set forth in the plans when obtaining prescription drugs, including Copaxone.

200. CDF and TAF knew that United members were parties to United benefit plans and that the plans required the members to pay cost-sharing obligations.

201. Even so, CDF and TAF intentionally interfered with those plan requirements by using the funds that they obtained from Teva to eliminate United members' cost-sharing obligations, by paying those cost-sharing obligations directly to the billing provider.

202. CDF's and TAF's interference caused United members to breach their agreements with United when they failed to pay the cost-sharing obligations set forth in their insurance plans.

203. CDF's and TAF's interference and procurement of those contractual breaches were wrongful and without justification, conducted solely to defeat the structure of United's managed-care system and to benefit Teva financially at United's expense.

204. For its part, Teva was aware of CDF's and TAF's tortious conduct, and encouraged it in the manner set forth in the Complaint.

205. Teva also provided substantial assistance in the achievement of CDF's and TAF's tortious interference with United members' contracts because it funded the payments that CDF and TAF made to the providers to cover United members' cost-sharing responsibilities.

206. Teva's wrongful assistance to CDF and TAF was a substantial factor in causing harm to United.

207. By virtue of the foregoing, United is entitled to compensatory and punitive damages, interest and costs, an injunction prohibiting Teva from continuing to engage in the tortious conduct described above, and any other relief deemed just and proper.

**COUNT IV: VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)**

208. United incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

209. Teva, CDF, and TAF are "persons" within the meaning of 18 U.S.C. § 1961(3), which conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

210. Teva, CDF, TAF, ACS, and AssistRX entered into an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a

tool to effectuate a pattern of racketeering activity. Teva, CDF, and TAF are each "persons" distinct from the Enterprise.

211. Teva established the Enterprise to covertly pay the cost-sharing obligations of Copaxone patients illegally using CDF and TAF as conduits for such payments.

212. Teva specifically knew this scheme violated federal and state laws as discussed throughout this Complaint.

213. The Enterprise engaged in and affected interstate commerce because, among other things, it marketed and induced prescriptions for Copaxone to thousands of individuals throughout the United States, illegally subsidized these Copaxone sales, and facilitated payments from United and other insurers for these Copaxone sales.

214. Teva asserted control over the Enterprise by organizing and funding the sham charitable funds that CDF and TAF used to pay cost-sharing obligations of Medicare beneficiaries enrolled in Medicare plans administered by United.

215. Teva has conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

216. Predicate acts of racketeering that Teva engaged in include, but are not limited to, deliberately causing false certifications and claims to be transmitted through the wires to United in order to fraudulently induce United to reimburse for Copaxone; use of the wires to transmit fraudulent reimbursement claims to United and other insurers; and use of the wires and mails to fraudulently conceal the Enterprise in order to induce United and other insurers to reimburse claims for Copaxone.

217. Teva's Enterprise employed the wires and mails in furtherance of its fraudulent scheme in doing at least the following:

      a.   Coordinating Teva's illegal payments to CDF and TAF, including by means of the communications specifically described herein;

      b.   Transferring illegal payments from Teva to CDF and TAF;

      c.   Disseminating false and misleading information concerning the availability of purportedly "charitable" funding and the nature of Teva's relationship with CDF and TAF;

      d.   Transmitting false certifications that claims for Copaxone complied with federal and state law; and

      e.   Inducing United to use the wires to pay claims tainted by the Enterprise's illegal kickback scheme.

218. The above-described acts reveal a continuous pattern of racketeering activity, in addition to the threat of continued racketeering activity.

219. The effect of Teva's racketeering activity was to fraudulently cause United and other insurers to reimburse claims for Copaxone that they would not otherwise pay, and to maintain or raise the price of Copaxone to higher levels than it would have commanded in the absence of the illegal conduct.

220. United suffered injuries when it reimbursed those prescriptions for Copaxone that otherwise would not have been made and when United paid the higher prices that resulted from the illegal conduct.

221. United's injuries were directly and proximately caused by Teva's racketeering activities as described above.

222. By virtue of these violations of 18 U.S.C. § 1962(c), Teva is jointly and severally liable to United for three times the damages United has sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT V: CONSPIRACY TO VIOLATE CIVIL RICO, 18 U.S.C. § 1962(d)**

223. United incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

224. 18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

225. Teva has violated 18 U.S.C. § 1962(d) by conspiring with CDF and TAF to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described herein through a pattern of racketeering activity.

226. Teva and its co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

227. The nature of the above-described co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing acts have been and are part of an overall pattern of racketeering activity.

228. As a direct and proximate result of Teva's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), United has been injured in its business and property as set forth more fully above.

229. The purpose and effect of the conspiracy was to cause United and other insurers to reimburse Copaxone claims through fraud, and to maintain or raise the price of Copaxone to a higher level than it would have commanded in the absence of the illegal conduct.

230. United suffered injuries when it paid the higher prices that resulted from the illegal, conspiratorial conduct.

231. By virtue of these violations of 18 U.S.C. § 1962(d), Teva is jointly and severally liable to United for three times the damages United has sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

## <u>COUNT VI</u>: UNJUST ENRICHMENT

232. United incorporates by reference the foregoing paragraphs as if fully set forth herein and further alleges as follows.

233. United has conferred direct benefits on Teva in the form of significant payments based on claims for Copaxone utilized by United members, and Teva has knowledge of those benefits.

234. Teva has voluntarily accepted and retained the payments it has received and other associated benefits conveyed to it by United as a result of its scheme to pay United member cost-sharing obligations.

235. Under the circumstances of this case, it would be inequitable for Teva to retain the payments and benefits it has received at United's expense.

236. The money Teva has received from United belongs in equity and good conscience to United.

237. By virtue of the foregoing, United is entitled to recover the substantial amount of payments Teva has improperly retained.

## COUNT VII: VIOLATIONS OF STATE DECEPTIVE TRADE PRACTICES LAWS

238. United incorporates by reference the foregoing paragraphs as if fully set forth herein and further alleges as follows.

239. United is a person or consumer entitled to protection under New Jersey's and other states' consumer protection laws.

240. By concealing its coordination and cooperation with CDF and TAF to pay for and eliminate United member's cost-sharing obligations, Teva deceived United into paying reimbursements for claims that it otherwise would not have paid.

241. Teva's conduct affected not only United, but also other similarly-situated payors, as evidenced by the False Claims Act case filed by the United States Government against Teva.

242. Teva directly and proximately caused significant damages to United in the form of payments United made for Copaxone, because of Teva's deception.

243. The nationwide fraudulent and deceptive business practices described herein violated the state consumer fraud, consumer protection, and/or deceptive trade practices laws of other states, and in particular the following laws:

     a.   Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* (Arizona);

     b.   Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

     c.   Colo. Rev. Stat. § 6-1-101, *et seq.* (Colorado);

     d.   Fla. Stat. § 501.201, *et seq.* (Florida);

     e.   815 Ill. Comp. Stat. § 505/1, *et seq.* (Illinois);

     f.   Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

     g.   Minn. Stat. § 325F.68, *et seq.* (Minnesota);

     h.   Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

49

       i.    N.J. Stat. Ann. § 56:8-2, *et seq.* (New Jersey);

       j.    Nev. Rev. Stat. § 41.600, *et seq.* (Nevada);

       k.   N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire); and

       l.    N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina).

244. Teva's conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

245. United is therefore entitled to actual damages or damages for each deception that occurred, punitive damages, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, United respectfully requests an award in its favor and against Defendants, jointly and severally, granting the following relief:

       a.    An award of compensatory damages as requested herein;

       b.    Equitable relief as requested herein;

       c.    Injunctive relief as requested herein;

       d.    Treble damages under 18 U.S.C. § 1964(c);

       e.    Costs of court;

       f.    Reasonable attorneys' fees;

       g.    Prejudgment and post-judgment interest; and

       h.    An award of any other relief in law or equity that the Court deems just and proper.

By: *s/Francis X. Manning*
Francis X. Manning
Robert J. Norcia
Stradley Ronon Stevens & Young, LLP
A Pennsylvania Limited Liability Partnership
LibertyView, 457 Haddonfield Road, Suite 100
Cherry Hill, NJ 08002
T: (856) 321-2403
F: (856) 321-2415
fmanning@stradley.com
rnorcia@stradley.com

Munir R. Meghjee (*pro hac vice* to be filed)
Jeffrey S. Gleason (*pro hac vice* to be filed)
Jamie R. Kurtz (*pro hac vice* to be filed)
Charlie S. Gokey (*pro hac vice* to be filed)
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402–2015
T: (612) 349–8500
F: (612) 339–4181
mmeghjee@robinskaplan.com
jgleason@robinskaplan.com
jkurtz@robinskaplan.com
cgokey@robinskaplan.com

*Counsel for Plaintiff United Healthcare Services, Inc.*