**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., *Plaintiff*, v. TEVA PHARMACEUTICALS USA, INC. and TEVA NEUROSCIENCE, INC., *Defendants*. | No. 22-cv-6643 (MEF)(MAH) **OPINION and ORDER** |

**Table of Contents**


I. Background
- A. Allegations
- B. This Lawsuit
- C. Procedural History
- D. The Motion

II. The Law
- A. Storm Warnings: In General
- B. Storm Warnings: Here
- C. The Court's Approach

III. Volume and Price
- A. Causation
  - 1. Obviousness
  - 2. Reports
    - a) New England Journal of Medicine
    - b) New York Times
    - c) Los Angeles Times
    - d) Barron's
    - e) Congressional Research Service
  - 3. Conclusion

B. **Identity**

1. **Litigation**

a) **Knowledge**

b) **Substance**

2. **The Teva Executive's Statement**

a) **Knowledge**

b) **Substance**

C. **Case Law**

1. **DeBenedictis**

2. **Mathews**

3. **Prudential**

4. **Benak**

IV. **The Ineligible Patient Theory**

V. **Conclusion**


* * *

There are two main players here.

First, a pharmaceutical company. It made a particular drug, and donated to charities that helped people afford it.

And second, an insurance company. It was billed when its customers were prescribed the drug.

The insurance company came to believe that the pharmaceutical company's charity payments aimed to increase the cost of the drug and the number of patients opting for it.

More people choosing a pricier drug meant more money to the pharmaceutical company (which made the drug) and more money from the insurance company (which had to cover the extra drug costs).

In light of this, the insurance company sued the pharmaceutical company --- alleging, among other things, violations of federal RICO law.

The pharmaceutical company has moved for summary judgment, arguing that the lawsuit was filed too late.

As to the RICO claims, the Court concludes that the pharmaceutical company has it right. Those claims are time-barred. They must be dismissed.

* * *

# I. Background

## A. The Allegations

An insurance company[1] administered a healthcare plan. See First Amended Complaint ("Complaint") (ECF 112) ¶¶ 17, 49-50.[2]

Under the plan, when people were prescribed a given medication, they generally had to make some payments to help cover the cost. See id. ¶¶ 31-33, 56. Co-pays, for example. See id. ¶ 56.

For its part, the insurance company had to make payments, too -- to cover some of the prescription's remaining cost. See id. ¶ 58.

Take for example a hypothetical patient, Ms. Smith. Say she was prescribed a medication that retails for $5. She could go to the pharmacy and pick the medicine up, provided she took care of her co-pay (of, say, $1). And the leftover cost of the prescription would then largely be covered by the insurance company.[3]

* * *

That was the basic set-up.

But the referenced insurance company[4] came to believe that a certain drugmaker[5] was taking advantage of the arrangement. See id. ¶¶ 1, 3-4, 12-14, 16, 89-92.

---

1 United Healthcare Services, Inc.

2 In this Opinion and Order, allegations sourced to the complaint are assumed to be true for present purposes. Cf. McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009).

3 "Largely," because a piece of the cost would be covered by the federal government, since the healthcare plan here is a Medicare Part D plan. See Complaint ¶¶ 1, 17, 49-50, 55.

4 Recall: United Healthcare Services, Inc.

5 The informal, everyday name for the drugmaker is Teva. But more precisely, the relevant companies are Teva Pharmaceuticals

Per the insurer, the drugmaker was donating money to charities. See id. ¶¶ 3, 8, 90, 95-105. And the charities were then turning around and paying people's co-pays for one of that drugmaker's drugs. See id. ¶¶ 3-4, 8, 99-100.

The drug: Copaxone, a treatment for multiple sclerosis, MS. See id. ¶¶ 1, 100

To see why this allegedly mattered, come back to the Ms. Smith example.

Say she was prescribed Copaxone, and Copaxone cost $5.[6] She could go pick it up, provided that her co-pay (of $1) was covered. The leftover cost of the Copaxone would then be taken care of, mainly by her insurance company.[7]

So far, same as before. But now mix in a difference --- say that Ms. Smith's co-pay was covered by a charity.

For Ms. Smith, Copaxone would now be essentially free. Someone else would be picking up the tab on the co-pay. What would have run her $1 would now cost her nothing.

The effect of this, multiplied over the large numbers of patients seeking MS treatment --- more people opting for Copaxone. See id. ¶ 230.

After all, why should a patient and her doctor think about cheaper alternative treatments if Copaxone is out there --- and, for the patient, would cost nothing?

And with more customers chasing Copaxone, the price of the drug could well rise, too. See id. ¶¶ 1-4, 34, 40, 42, 154, 170.

* * *

On the insurance company's way of seeing things, the charity donations worked as a kind of "kickback[]" scheme, id. ¶ 1 ---

USA, Inc. and Teva Neuroscience, Inc. Teva Pharmaceuticals seems to be a subsidiary of Teva Neuroscience. See Complaint ¶¶ 18-19. But their exact relationship is not relevant here. For ease of reference, the two Teva companies are treated throughout this Opinion and Order as a single entity --- and referred to as a singular "drugmaker," not plural "drugmakers."

[6] This number is just an illustration. How much Copaxone cost at any given time is not relevant here.

[7] With some government kick-in. See footnote 3.

drugmaker charity contributions induced more Copaxone purchases and higher Copaxone prices. And for the drugmaker, the benefit of more Copaxone sales and higher Copaxone prices more than made up for the cost of its donations. See id. ¶¶ 1-4, 34, 40, 42, 154, 170, 230, 240.

On the whole then, the charity donations seemed to be good for the drugmaker.[8] But they were allegedly bad for the insurance company. The added sales and the higher prices --- these needed to be paid for by someone, and the insurance company was left footing some of the extra bill. See id. ¶¶ 1, 12-13, 169-72.

From the insurance company's perspective, the drugmakers' charity payments pushed up Copaxone sales and prices --- and in doing so, essentially transferred money from the insurance company (that had to pay the extra Copaxone costs) to the drugmaker (which profited from the extra costs).

### B. **This Lawsuit**

In light of the above, the insurance company[9] (from here, "the Plaintiff") sued the Copaxone drugmaker (from here, "the Defendant").[10]

The Plaintiff's lawsuit was filed on November 16, 2022. See Complaint (ECF 1) at 1.

The operative complaint alleges that the Defendant violated the federal RICO[11] law, see Complaint ¶¶ 219-33 (Count IV), and conspired to violate RICO. See id. ¶¶ 234-42 (Count V).

The complaint also includes state-law claims.[12] Those claims are not taken up in this Opinion and Order. Rather, they are addressed in a separate order, to be issued later today.

---

[8] And also for certain patients.

[9] Recall: United Healthcare Services, Inc.

[10] As noted, the two defendant/pharmaceutical companies (Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc.) are referred to throughout this Opinion and Order in the singular, as one defendant. See footnote 5.

[11] RICO is short for the "Racketeer Influenced and Corrupt Organizations" Act. It is codified at 18 U.S.C. § 1961 et seq.

[12] Common law claims for fraudulent concealment, see Complaint ¶¶ 176-96 (Count I); tortious interference with contract, see

### C. Procedural History

After the initial complaint was filed, the Defendant moved to dismiss on various grounds. See Notice of Defendants' Motion to Dismiss the Complaint (ECF 27).

One of its arguments: that the Plaintiff's claims were pressed too late, after the limitations period had run out. See Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF 27-1) at 17-27.

At oral argument on the motion to dismiss, the Court noted that the Defendant had "introduced a mountain of extrinsic evidence" on the limitations-period argument. Transcript of Motion Hearing Held on September 19, 2023 (ECF 90) at 22:12. This suggested that the time-bar argument was "ripe for conversion to [a] Rule 56" motion for summary judgment. Id. at 22:18; see also id. at 22:19-20, 25:5-8, 26:6-9; Nov. 27, 2023 Order (ECF 87) at 1.

So the Court denied the then-pending motion without prejudice --- to allow for "tightly targeted discovery" as to whether the Plaintiff's claims were filed too late. See Nov. 27, 2023 Order at 2; see also Stipulation and Order Regarding Amended Case Schedule (ECF 98).

### D. The Motion

Discovery got underway and then wrapped up, and the Defendant has now moved for summary judgment --- solely on the ground that the Plaintiff's claims are time-barred. See Notice of Defendants' Motion for Summary Judgment on Statute of Limitations Defense (ECF 156).

---

id. ¶¶ 197-207 (Count II); aiding and abetting tortious conduct, see id. ¶¶ 208-18 (Count III); and unjust enrichment, see id. ¶¶ 243-48 (Count VI). Plus claims under the consumer protection statutes of eleven states. See id. ¶¶ 249-59 (Count VII) (New Jersey); id. ¶¶ 260-68 (Count VIII) (Arizona); id. ¶¶ 269-78 (Count IX) (California); id. ¶¶ 279-88 (Count X) (Colorado); id. ¶¶ 289-97 (Count XI) (Florida); id. ¶¶ 298-309 (Count XII) (Illinois); id. ¶¶ 310-18 (Count XIII) (Michigan); id. ¶¶ 319-29 (Count XIV) (Minnesota); id. ¶¶ 330-38 (Count XV) (Nebraska); id. ¶¶ 339-47 (Count XVI) (Nevada); id. ¶¶ 348-59 (Count XVII) (New Hampshire); id. ¶¶ 360-68 (Count XVIII) (North Carolina).

The motion is now before the Court.[13]

Work through it below. The law first, covered in Part II. And then the Court's analysis of how the law applies in this case, laid out in Part III and Part IV.

The Court's conclusion: as to the RICO claims, the motion must be granted; those claims are time-barred. See Part V.

## **II. The Law**

Start with a quick overview of the governing law.

* * *

The Plaintiff's RICO claims have a four-year limitations period. See Agency Holding Corp. v. Malley-Duff & Assocs. Inc., 483 U.S. 143, 156 (1987).

The four-year clock starts ticking from "'when the plaintiffs knew or should have known of their injury'" and "the source of their injury." Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 359 F.3d 226, 233 (3d Cir. 2004) (quoting Forbes v. Eagleson, 228 F.3d 471, 484-85 (3d Cir. 2000)).[14]

---

[13] As noted, this Opinion and Order considers the time-bar argument only as to the Plaintiff's RICO claims.

[14] A note here on injury and source. The Third Circuit has stated that "[t]here may be some tension between the accrual rule [previously] laid out Prudential --- that a federal RICO claim accrues only after a plaintiff knows of both the injury and the source of the injury --- and the Supreme Court's instruction that a federal RICO claim accrues upon 'discovery of the injury, not discovery of the other elements of a claim.'" LabMD Inc. v. Boback, 47 F.4th 164, 179 n.10 (3d Cir. 2022) (internal citation omitted) (quoting Rotella v. Wood, 528 U.S. 549, 555 (2000)). Injury and source, as in Prudential? Or just injury, as Rotella might suggest? These questions can be sidestepped for now. The more plaintiff-friendly test is the two-part Prudential test, which requires storm warnings as to both injury and source. And even applying that plaintiff-friendly test (as this Opinion and Order does), the Court concludes that the Plaintiff's RICO claims must be dismissed because the Plaintiff was on notice as to both injury and source more than four years before it filed suit.

This is an "inquiry notice" test, and the analysis "proceeds in two steps." Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 507 (3d Cir. 2006).

At the first step, "the burden is on the defendant to show the existence of 'storm warnings.'" Id. (quoting Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 252 (3d Cir. 2001)).

Storm warnings can be "any information or accumulation of data 'that would alert a reasonable person,'" id., to the "possibility" of injury. In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 543 F.3d 150, 164 (3d Cir. 2008).[15] "It is enough that a reasonable [plaintiff] of ordinary intelligence would have discovered the information and recognized it as a storm warning." Mathews, 260 F.3d at 252.

If the defendant meets its burden and the first box is checked, then it is on the second step.

At that point, the burden slides over to the plaintiff --- to show that, in the face of the storm that seemed to be coming, it tried to steer clear. "[H]eeding the storm warnings, [the plaintiff must show that it] exercised reasonable diligence but w[as] unable to find and avoid the storm." Cetel, 460 F.3d at 507 (quoting Mathews, 260 F.3d at 252; Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006)).

* * *

In this case, only the first of the two steps is in play.

---

[15] Although some earlier cases spoke of "probability," the Third Circuit has clarified that a "probability . . . is not necessary to trigger storm warnings in this circuit." In re Merck, 543 F.3d at 164. Rather, "'whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had sufficient information of possible wrongdoing to place them on inquiry notice or to excite storm warnings.'" Id. (emphasis added) (quoting Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006)). This is consistent with "the majority of courts of appeals," which "employ a possibility standard when evaluating . . . storm warnings." Id.

This is because the Plaintiff has not argued that it took any actions in the face of possible storm warnings. It does not say, for example, that it got going on an investigation.[16]

So the second step melts away. It is off the table, and what must be resolved here concerns only the first step --- the were-there-storm-warnings step.

Has the Defendant carried its burden of showing that as of November 16, 2018 --- four years before this case was filed --- there were adequate storm warnings?

If yes, the Plaintiff's RICO claims came too late, and they are time-barred.

If no, the RICO claims were timely filed, and they can go forward.

### A. **Storm Warnings: In General**

To determine whether there were storm warnings as of a certain date, the Court must "start by identifying [the Plaintiff's] injury and the injury's source." LabMD Inc. v. Boback, 47 F.4th 164, 179 (3d Cir. 2022).[17]

"[I]njury" and "source." Id. Two separate things.

In LabMD, for example, the injury was the plaintiff's alleged financial loss. See id. at 180. And the "source" was the

---

[16] Why not? Because per the Plaintiff, doing so would have been futile. See Plaintiff's Brief at 28-29 (arguing that "[e]ven if United had had reason to suspect Teva's scheme . . . United could not have uncovered the necessary details to file suit"). But this is no reason not to run things down. "[I]f storm warnings existed, and the [Plaintiff] chose not to investigate, [the court must] deem them on inquiry notice of their claims." Mathews, 260 F.3d 252 n.16; see also Benak, 435 F.3d at 401 ("Plaintiffs cannot, post hoc, excuse a failure to inquire by demonstrating the difficulty they would have had attaining relevant information."); In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1327 (3d Cir. 2002) ("This Court has previously held that 'excusing [plaintiffs'] lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury . . . would, in effect, discourage investigation.'") (cleaned up) (quoting Mathews, 260 F.3d at 252 n.16).

[17] Cf. footnote 14.

defendant's alleged "fraudulent representations," the ones that "proximately cause[d]" those losses. Id. at 179 (internal quotation marks omitted).

* * *

To see how this works, think of a RICO claim that is based in part on harms from asbestos exposure.

* * *

As to "injury," a court must ask whether there were sufficient warnings that the plaintiff had been harmed. Lung damage, for example, that resulted in financial knock-on effects to the plaintiff's business. Cf. Med. Marijuana, Inc. v. Horn, 604 U.S. 593, 600-01 (2025).

* * *

After that, a court must consider the injury's "source" --- an inquiry that folds two questions into the same mix.

The first "source" question: was there enough warning that the defendant, in particular, was the source of the injury? That the lung-damaging asbestos was embedded in the walls of the defendant's house and not someone else's?[18]

In essence, this first question asks whether there was enough warning out there as to who was hurting the plaintiff --- and therefore who the plaintiff might be expected to gear up to sue during the limitations period.

The second "source" question: was there enough of a warning that the cause of the injury might be asbestos?

Knowing in 1900 that a house had asbestos in it was different than knowing the same thing in 2000.[19] In 1900, "a reasonable

---

[18] See LabMD, 47 F.4th at 180 ("Even if [the plaintiff] did not have actual knowledge that the FTC had gotten its information about [the plaintiff] from [the defendant], there were enough 'storm warnings' that it should have known that [the defendant] was the source."); see also, e.g., Blystra v. Fiber Tech Grp., Inc., 407 F. Supp. 2d 636, 642 (D.N.J. 2005) ("[The plaintiff] was sufficiently aware of the facts and circumstances to identify that (a) he had been injured and (b) the injury arose out of actions taken by the Defendants[.]").

[19] Cf., e.g., Prudential, 359 F.3d at 229-30 (noting that asbestos became "a well-known and important public health and

[plaintiff] of ordinary intelligence [might] have discovered the information [about the asbestos in the defendant's walls] and [still not] recognized it as a storm warning." Mathews, 260 F.3d at 252.

But by 2000, the same "reasonable [plaintiff]" would likely have "recognized" the significance of the asbestos as a storm warning --- as a red flag indicating that there might be "trouble ahead," such that it makes sense to "slow down" and investigate some. Wu v. GSX Techedu Inc., 738 F. Supp. 3d 527, 560 (D.N.J. 2024) (cleaned up).[20]

* * *

To summarize.

The four-year limitations period begins to run from the moment sufficient storm warnings have gathered as to (i) the plaintiff's injury, and (ii) its source.[21] See LabMD, 47 F.4th at 179-80.

As to (ii), "source" --- that box is checked when the storm warnings provide enough of a heads-up as to two things. First, identity. Who took the action that resulted in injury. See id. at 180-81. And second, causation. Whether the action could have lead to the injury. See id.

**B. Storm Warnings: Here**

Start with the alleged injury in this case: the Plaintiff's payouts for its insureds' Copaxone --- pay-outs that in whole or

---

safety issue in the United States" in the 1970s and early 1980s).

[20] Wu was not a limitations period/storm warnings case. See 738 F. Supp. 3d at 536. It turned on whether certain "red flags" suggested that particular corporate officials had acted with scienter. See id. at 536-37, 559-60. But the analyses are somewhat similar. In each context, the question is whether certain information (a "storm warning" or a "red flag") should have goaded a person (or a company) into following up and trying to learn more. See id. at 560 (explaining that a "red flag is 'a signal of possible danger around the curve'" that "provides a reason to investigate further") (quoting Hacker v. Elec. Last Mile Sols. Inc., 687 F. Supp. 3d 582, 591 (D.N.J. 2023)).

[21] Cf. footnote 14.

in part the Plaintiff would allegedly not otherwise have needed to make. See Complaint ¶¶ 230-31, 240-41.

As to this part of the inquiry --- asking whether there were storm warnings as to the Plaintiff's injury --- there is no issue.

Neither party zeroes in on this question. And with good reason. If the Plaintiff-insurer actually suffered the monetary losses alleged --- its injury would have been no hard-to-spot mystery. The Plaintiff would have known (or at least should have known) what it was paying out on Copaxone claims (how often, and at what rate).

After all, only the most rudimentary records would have been required to have a sense of this. And businesses can be presumed to generate and keep records of this sort. Cf. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").[22]

And all the more so when it comes to insurance companies, which are required to generate (and then disclose) records with this kind of data. See, e.g., Questions and Answers on Obtaining Prescription Drug Event (PDE) Data, Ctrs. for Medicare & Medicaid Servs, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovGenIn/Downloads/PartDClaimsDataQA.pdf (last accessed July 6, 2026) ("Every time a beneficiary fills a prescription under Medicare Part D, a prescription drug plan sponsor must submit a summary record called the prescription drug event (PDE) data to CMS. . . . The PDE record contains prescription drug cost and payment data.").

The point is stronger yet when it comes to a very large insurance company like the Plaintiff --- which has described

[22] Indeed, information put before the Court affirmatively suggests that the Plaintiff kept these types of records. See Exhibit 200 to Harvey Bartle's Declaration in Support of Teva's Motion for Summary Judgment ("Bartle Declaration") (ECF 159-96) (stating, in a February 2024 email between counsel, that the Plaintiff would "produce pharmacy claims data for Medicare claims for Copaxone" during a relevant time frame); Exhibit 201 to Bartle Declaration (ECF 159-97) (discussing the same, in a March 2024 email).

itself as "processes[ing] millions of health care claims per day." Complaint ¶ 49. In this area of the law, it is routinely presumed that companies like this are especially sophisticated. See Prudential, 359 F.3d at 234 (describing the plaintiff as a "very sophisticated company. . . operat[ing] a large casualty insurance business"); cf. also, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Gen. Star Indem. Co., 216 F. App'x 273, 279 (3d Cir. 2007); Post v. Hartford Ins. Co., 501 F.3d 154, 166 (3d Cir. 2007), overruled on other grounds by, Est. of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009).

In short, a sophisticated insurance company should have known (even if it somehow did not actually know) roughly how many Copaxone claims it was covering, and how much the claims were costing. Indeed, no one contests any of this.

The injury box is checked.

* * *

Move now to the alleged injury's source, and the two questions that together make up that inquiry --- as to (i) the identity of the possible defendant, and (ii) causation. See Part II.A.

The Court asks the following questions.

First, were there storm warnings from which the Plaintiff knew or should have known that the relevant charity payments were being made by the Defendant in particular? Or were the payments out of sight, too hard to spot and too hard to attribute?

And second, were there warnings from which the Plaintiff knew or should have known that charity payments might well cause it injury? Was there an apparent-enough mechanism that linked the Defendant's alleged conduct (charity payments) to the Plaintiff's alleged injury (spending more on Copaxone claims)? Or was the causal mechanism too obscure to suggest to a "reasonable" plaintiff[23] the "possibility"[24] of an injury?

* * *

The second question, about cause and mechanism --- that is somewhat complicated here.

---

[23] Cetel, 460 F.3d at 507.

[24] In re Merck, 543 F.3d at 164.

The reason why: without quite saying so, the Plaintiff offers up three injury theories, three distinct sorts of ways in which the Defendants' alleged charity payments allegedly caused the Plaintiff to pay out too much money on Copaxone claims.

In this Opinion and Order, these three types of alleged injuries are broken out, as described in the next section.

### C. **The Court's Approach**

Part III analyzes two of the Plaintiff's three theories of injury and asks whether there were sufficient storm warnings as to those before November 16, 2018.[25]

The Court's conclusion is "yes," so the Plaintiff cannot press RICO claims that rest on either of those two theories. They are time-barred.

Part IV asks whether were there were storm warnings, before November 16, 2018, on the third of the Plaintiff's three theories.

Same answer: "yes." So the Plaintiff cannot press RICO claims based on that theory, either. Those claims also come too late.

## **III. Volume and Price**

Take first two of the Plaintiff's three injury theories.

* * *

Call the first of these the "volume theory."

This is the idea that because patient Copaxone co-pays were covered by someone other than the patient,[26] people were opting to pursue Copaxone prescriptions more often. As a result, the Plaintiff was on the hook to make payments for the extra Copaxone prescriptions. See, e.g., Complaint ¶ 230 (invoking

---

[25] Recall that this case was filed on November 16, 2022, and the limitations period for civil RICO claims is four years. See Part I.B., II. So if there were storm warnings as to an injury theory before November 16, 2018, RICO claims that rest on that theory are time-barred.

[26] Two charities allegedly funded by the Defendant: Chronic Disease Foundation ("CDF") and The Assistance Fund Inc. ("TAF"). See Complaint ¶ 3.

the volume theory by asserting that the Defendant's activity "cause[d the Plaintiff] to . . . maintain Copaxone sales at higher levels than it would have commanded in the absence of the illegal conduct").

Call the Plaintiff's second injury theory the "price theory."

This is the idea that because Copaxone co-pays were allegedly covered by someone other than the patient,[27] prices for Copaxone were higher than they otherwise would have been. This would also injure the Plaintiff, because each Copaxone prescription it had to cover cost more. See id. ¶¶ 2-4, 34-35, 230-31, 240-41.

* * *

Recall that as to the "injury" and "source" test, injury is not in play. See Part II.B. So the relevant question here is only as to source --- and source is a two-part inquiry. See Part II.A.

As to the first part of the "source" inquiry, concerned with causation,[28] the Court concludes that by November 16, 2018, there were sufficient storm warnings suggesting that charity payments funded by pharmaceutical companies to cover co-pays could well push up both the amount of a drug that was prescribed (the volume theory) and also its price (the price theory). See Part III.A.

As to the second part of the "source" inquiry, concerned with the identity of possible defendants,[29] the Court concludes that by November 16, 2018, there were sufficient storm warnings that the Defendant in particular was making charity payments to cover Copaxone co-pays. See Part III.B.

In light of this, all reasonable jurors would conclude that there were storm warnings as to both the Plaintiff's volume theory and its price theory --- and the caselaw backs up that conclusion. See Part III.C.

So bottom line: the Plaintiff's RICO claims are time-barred to the extent they rest on either the price theory or the volume theory.

---

[27] As noted, by Defendant-funded charities. See footnote 26.

[28] See Part II.A.

[29] See Part II.A.

### A. Causation

By November 16, 2018, were there storm warnings that charities covering Copaxone co-pays could cause an increase in Copaxone prescriptions and in Copaxone prices?

The Court concludes that there were.

These causal links are obvious enough. See Part III.A.1.

So the winds were already swirling on their own. Not much more was needed, if anything, to alert the Plaintiff to the possibility of injury. And here, there was more. Numerous articles and reports, all from before November 16, 2018, set out both the volume theory and the price theory. See Part III.A.2.

#### 1. Obviousness

The volume theory, as noted, is that more Copaxone prescriptions would be pursued if meaningful numbers of patients did not cover their own Copaxone co-pays.

This is self-evident. Co-pays generally work as a kind of "speed bump," that "encourage[s] the patient (and her doctor) to slow down a bit, and to consider lower-cost options --- something cheaper than the drug." In re Revlimid & Thalomid Purchaser Antitrust Litig., 2026 WL 765641, at *1 (D.N.J. Mar. 18, 2026) (citing Nicole Fusco, et al., Cost-Sharing and Adherence, Clinical Outcomes, Health Care Utilization, and Costs: A Systematic Literature Review, 29 J. Managed Care & Specialty Pharmacy 4, 5 (2023)); see Complaint ¶¶ 31-46.

But for a patient whose Copaxone co-pays are covered by someone else, Copaxone becomes essentially free. The speed bump has been flattened out. It is gone, and there is no longer any financial incentive for the patient to tap the brakes, to pause for long enough to seek out cheaper alternative treatments.

Other things being equal, this undoing of the financial incentive will tend (and obviously tend) to push up on the numbers of people opting for Copaxone. And that is what the volume theory is all about.

* * *

The price theory is adjacent to the volume theory.

Per the complaint, "many drug manufacturers have attempted to circumvent the downward pricing pressure caused by member cost-sharing obligations by . . . paying those cost-sharing obligations on behalf of the members." Complaint ¶ 35. "The result of these . . . payments by the drug manufacturers is that the member is not exposed to the cost of the drug, allowing manufacturers to maintain already high prices or inflate prices further without having to worry about objections or outcry from the end-user patients." Id.

If more people are choosing Copaxone (because for some patients there will be no co-pays), then the increase in demand for the drug will also tend to push up on Copaxone prices.

This is common sense. And it is bread-and-butter economics, too. See, e.g., Robert S. Pindyck & Daniel L. Rubinfeld, Microeconomics 27 (8th ed. 2013) (explaining that when there is an upward shift in demand, the equilibrium price will rise, other things being constant).[30]

---

[30] Two things here. First, note that the impact of higher demand on prices is usually even stronger when supply is relatively inelastic. See, e.g., Pindyck & Rubinfeld, Microeconomics, at 27, 33. And for much of the relevant period here, that would have been the case. There was no generic alternative to Copaxone until 2015. See Andrew Pollack, Generic Version of Copaxone, Multiple Sclerosis Drug, is Approved, New York Times (Apr. 16, 2015), https://www.nytimes.com/2015/04/17/business/generic-version-of-copaxone-multiple-sclerosis-drug-is-approved.html. So other entities could not readily respond to rising demand simply by producing their own version of Copaxone --- and by doing so, tugging down on its topline price. See Complaint ¶¶ 219-20, 229-30. A second point. The volume and price theories are not somehow hidden away, to be ferreted out only after a tough search. The opposite. Courts, for example, have matter-of-factly alluded to these theories in other cases, treating them as all-but self-evidently true. See, e.g., United States v. Teva Pharma. USA, Inc., 560 F. Supp. 3d 412, 416 (D. Mass. 2021) (noting, without extensive citation or discussion, that patient co-pays are "intended to encourage physicians and beneficiaries to be efficient consumers of federally-reimbursed health care products and to encourage drug manufacturers to price their products based on market forces"); MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc., 722 F. Supp. 3d 1296, 1306 (S.D. Fla. 2024) ("Congress requires Medicare beneficiaries to

### 2. Reports

As noted above, the volume theory and the price theory are prominent enough on their own, because they are obvious to a real extent.

And extensive public reporting, sampled here, cinches things. This reporting makes clear that long before November 2018, it was widely thought that when charities covered co-pays for a certain drug, that could well (i) increase the number of patients taking the drug, and (ii) keep the drug's price relatively high.

To see the point, tick through some articles, just below. And note that in these articles, the charities are often called "patient-assistance programs." See also, e.g., Complaint ¶¶ 6, 37, 42, 45, 69, 79 (using the same terminology).

#### a) New England Journal of Medicine

Start with a 2014 New England Journal of Medicine article.[31]

In bright lights, its title teed up the question: "Drug Companies' Patient-Assistance Programs --- Helping Patients or Profits?" Exhibit 27 to Harvey Bartle's Declaration in Support of Teva's Motion for Summary Judgment ("2014 NEJM Article") (ECF 158-27) at 2.

---

pay a certain amount, known as a co-payment, for drugs that are insured through the program to keep pharmaceutical companies from inflating their prices with no market forces to serve as a check."); see also MSP Recovery Claims, Series LLC v. Lundbeck LLC, 130 F.4th 91, 99 (4th Cir. 2025) ("Medicare's cost-sharing obligation functions as 'a market safeguard against inflated prices.'") (quoting OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70626 (Nov. 22, 2005)).

[31] The New England Journal of Medicine describes itself as "the most widely read, cited, and influential general medical periodical in the world," and asserts that "[m]ore than a million people from nearly every country read NEJM in print and online each week." About NEJM, The New England Journal of Medicine (last accessed July 6, 2026), https://www.nejm.org/about-nejm/about-nejm.

And in its first sentence, the article explained that "patient cost sharing in the form of copayments, coinsurance, and deductibles is one of the most reliable methods for reducing health care costs." Id. This means that "the interests of insurers" --- who generally want to keep a lid on cost --- can be "at odds with the interests of . . . drug . . . manufacturers, who generally benefit when patients use more services." Id.

The article went on to explain that drug "manufacturers have attempted to blunt the impact of drug copayments and coinsurance" by donating to patient assistance programs. Id. Giving to those sorts of charities can allow drug manufacturers to "increase demand" for their drugs because without co-pay assistance, "some patients may decide against taking an expensive medication." Id. But when co-pays are taken care of, there is less reason for a patient to look around for alternatives. So "patient-assistance programs can convert such patients from nonusers to users." Id.

In a nutshell, that is the Plaintiff's volume theory.

The New England Journal article also took up the Plaintif's price theory.

It explained that donation arrangements allow drugmakers to "charge higher prices" for their products, id., because "[e]conomic theory predicts that if patient demand becomes less sensitive to prices, manufacturers of on-patent drugs will respond by setting higher prices." Id. at 3.

And the article also pressed on from theory to evidence. "In 1989, Germany began requiring patients to pay higher out-of-pocket costs for drugs with prices that exceed those of similar drugs." Id. And "[a]fter this policy was implemented, drug prices dropped by 10 to 26%." Id.

In short, drugmaker donations to patient assistance programs can "help individual patients," id. at 4, but they also can cause a run-up in "costs for insurers," id. --- and so "insurers have tried to discourage participation in patient-assistance programs." Id. at 3.

"[I]nsurers have tried." In the past tense, more than four years before the Plaintiff/insurer's storm warning cut-off date here, in November 2018.

**b) New York Times**

Next up, a New York Times[32] story from the year before the New England Journal of Medicine piece.

The title of the Times article: "Drug Maker's Donations to Co-Pay Charity Face Scrutiny." Exhibit 23 to Bartle Declaration ("2013 NYT Article") (ECF 158-23) at 2. And its context: "drug prices have soared in recent years" along with the rise of "co-payment assistance charities [like] the Chronic Disease Fund."[33] Id. (cleaned up).

Per the article, it "ha[d] long been an open secret" that the "bulk of the contributions to these charities come from the pharmaceutical companies," and that these sorts of charities "raise drug company sales and profits." Id.

"Sales." The volume theory. And "[p]rofits." The price theory.

Each of these theories was "long . . . an open secret." Id. That is, a secret --- but not really. Rather, they were "supposedly [confidential] but [in reality were a] generally known matter." Open Secret, Merriam Webster, https://www.merriamwebster.com/dictionary/open%20secret (last visited July 9, 2026).

Per the Times article:

---

[32] The New York Times was a very popular newspaper at the point when the referenced article came out. See, e.g., January 2013 Top Media Outlets, Burrelles Luce (last accessed July 6, 2026), https://burrelles.com/wp-content/uploads/2017/12/Top_Media_2013_January2013_Final.pdf (listing the Times as the third most widely read daily newspaper in the United States during the year in question). This information can be considered here. Courts "may consider facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." In re PHP Healthcare Corp., 128 F. App'x 839, 844 (3d Cir. 2005). And Rule 201 allows for consideration of "fact[s] that [are] not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

[33] The Chronic Disease Fund, CDF, was alluded to earlier, see footnote 26, and it will come up later.

> Critics say co-pay assistance helps keep drug prices high and circumvents efforts by insurers to control drug spending by making consumers bear part of the cost. "These subsidies are unfortunately used to promote the overutilization of expensive brand-name drugs," said Wells Wilkinson, a lawyer at Community Catalyst, a consumer advocacy organization.

Id. at 4 (emphases added).

"Overutilization" --- the volume theory. Id. And "keep drug prices high" --- the price theory. Id.

And more:

> [I]f a patient cannot afford out-of-pocket costs of $5,000 for a $100,000-a-year-drug, the drug company gets nothing. But if the manufacturer or the charity pays the $5,000, the patient gets the drug, and the company receives $95,000 from the patient's insurance company or Medicare.

Id. at 2 (emphasis added).

#### c) **Los Angeles Times**

Look now to a 2015 Los Angeles Times[34] article: "Why Big Pharma's patient-assistance programs are a sham." Exhibit 30 to Bartle Declaration ("2015 LA Times Article") (ECF 158-30) at 2.

"[P]atient-assistance programs, through which drugmakers cover patient co-pays or other costs for their expensive medicines[,] . . . are detested by insurers" because "[t]hey increase demand [for the drugs and] allow companies to charge higher prices" for them. Id. (cleaned up).

The volume theory ("increase demand") and the price theory ("higher prices"). Id.

Their import widely-enough known to be "detested by insurers" --- years before the Plaintiff/insurer's storm-warnings cut-off date in this case. Id.

---

[34] See January 2013 Top Media Outlets, Burrelles Luce (listing the Los Angeles Times as the fourth most widely-read daily newspaper in the United States at roughly the time of the cited article); see also footnote 32.

The article also explained that "[drug m]anufacturers can afford to pay a lot of $25 to $50 co-payments in return for even a small increase in sales of a $50,000 drug." Id. (cleaned up). And that drugmakers' charity donations lead to "increase[d] demand" for their drugs and "allow [those] companies to charge higher prices" for them. Id.

Moreover, per the article, "private insurers . . . dislike these programs because subsidizing the patients undermines what may be their most important tool for controlling healthcare costs, which is steering patients to low-cost alternative[s]." Id. at 3. "[P]atients are immunized against their small share of the [drug's] cost" under these programs, but "the insurers and government still have to pick up the rest" of the tab. Id.[35]

The article also noted that one pharmaceutical company was "under fire for jacking up the price of its . . . drug . . . from $13.50 to $750 per pill [while] impl[ying] that a patient-assistance program will cover low-income patients who can't afford their share of the [rising] cost." Id. at 2-3.

**d) Barron's**

In 2013, Barron's also ran an article on the Chronic Disease Fund.[36] See Exhibit 22 to Harvey Bartle's Declaration in Support of Teva's Motion for Summary Judgment ("2013 Barron's Article") (ECF 158-22).

Per the article, between "2007 and 2012, the Chronic Disease Fund's tax returns show[ed] that it pulled in donations of more than $900 million, mostly from drug companies," id. at 2, and "[e]ver since Medicare added its Part D drug benefit, the program's guardians have worried about drug companies subsidizing a patient's co-payment to induce an expensive Medicare drug claim." Id. at 5.

---

[35] See also, e.g., Exhibit 63 to Bartle Declaration ("2017 WSJ Article") (ECF 158-63) at 2 (explaining that "[d]rugmakers donate hundreds of millions of dollars a year to charities that help U.S. patients cover out-of-pocket costs for drugs. In turn, the drugmakers rely on the charities to effectively boost the sales of those drugs. The assistance ensures patients fill their prescriptions, and insurance pays the rest of the tab.").

[36] The Chronic Disease Fund, see footnote 26, will come up later.

The article also discussed how drug companies are said to benefit from making the donations, while insurers are said to suffer. See id. at 4-5.

And it walked through the Chronic Disease Fund's interactions with Questcor, one of the "numerous drug makers," id. at 2, that it had a donation arrangement with. See id. at 2-3. Per the article, "without the [Chronic Disease Fund donation arrangement to] defray [patients'] thousand-dollar co-pays," id. at 3, Questcor ran a real risk that "patients would abandon [Questcor's drug] for [less expensive] generic alternatives." Id.

But in light of Questcor's "collaboration," id., with the Chronic Disease Fund, things ran the other way. Questcor saw a "rise in sales" of its drug, and also raised the price of the drug "from $1,650 to $23,000." Id. at 4.

This illustrates the volume theory and the price theory. And it sketches out the impact on insurers, too. After a patient's co-pay was covered by the charity, the article noted, "a course of [Questcor's drug] treatment . . . can [still] cost insurers or the government hundreds of thousands of dollars." Id.

**e) <u>Congressional Research Service</u>**

Finally, look to a 2017 report from the Congressional Research Service.[37] Exhibit 64 to Bartle Declaration (ECF 158-64).

The report all but explicitly invoked the volume theory and the price theory. Per the report, patient assistance programs "are used to bolster prescription drug sales and prices and can increase costs for government and commercial health payers." Id. at 3.

As to price: the charity programs "bolster prices of prescription products" because "when consumers are relieved of cost-sharing obligations, there may be less market constraint on drug prices." Id. at 6.

[37] As to the special reliability of Congressional Research Service reports, see, for example, CITGO Petroleum Corp. v. Ascot Underwriting Ltd., 158 F.4th 368, 389 & n.8 (2d Cir. 2025); and Kareem v. Haspel, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

And as to volume: the charity programs can "induc[e] individuals to use [the donors'] more expensive brand-name drugs in cases where generics or other lower-cost substitutes are available." Id.

The article also noted the impact on insurers, explaining that while the charity programs "reduce the amount an insured consumer has to pay out of pocket for a drug, . . . [they] generally do[] not reduce the price an insurer . . . is charged for the drug." Id. (emphases added). Indeed, studies showed that the programs generate "higher costs to . . . insurance plans." Id. at 27; see also id. (explaining that coupons, which have similar effects to patient-assistance programs, increase the number of prescription "enrollee[s]" and their "prescription adherence," but "at the cost of . . . higher costs to their insurance plans").

### 3. Conclusion

Where things stand.

For years before the key date here of November 16, 2018, there were warnings that in funding certain sorts of charities, drugmakers were causing insurers to bear greater costs --- as more patients signed up for particular prescription drugs, and as the cost of the drugs that were prescribed went up.

The warnings were implicit, a matter of common sense. See Part III.A.1.

And the warnings were explicit --- coming in the form of repeated public statements made from highly visible perches. Some of the Nation's most prominent newspapers. See Part III.A.2(b)-(c). Its leading medical journal. See Part III.A.2(a). And the Congressional Research Service. See Part III.A.2(d).

The warnings, in short, were offered up in a consistent and loud way. A steady drumbeat. Not some isolated notes, here and there.

Descriptions of an "open secret," of widespread, commonplace practices that insurers "dislike" or "detest," and that cost insurers large amounts of money --- all of this, alluded to in the publications described above, would have (or should have) piqued the Plaintiff's attention, and held it.

Especially since the Plaintiff is a large and sophisticated company, see Part II.B, and one that actively followed industry news --- of which more below in Part III.B.2.

Against this backdrop, no reasonable juror could conclude that there were insufficient storm warnings as to causation well before November 16, 2018 --- warnings that pharmaceutical company donations to charities that covered patient co-pays could well cause a real up-tick in prescriptions and prices. See Part III.A.2.

But causation is only one part of the "source" inquiry. See Part II.B. The other part is taken up in the next section.

### B. Identity

As to "source," the Defendant must show (in addition to causation) that the Plaintiff had sufficient and timely storm warnings as to who was potentially causing it injury. See Part II.B.

Here, that bar is cleared, for the reasons set out just below.

#### 1. Litigation

In 2011, the IRS began investigating whether drug companies were making donations to a particular charity (CDF[38]) to cover patient co-pays on the drug companies' own drugs. See United States' Brief in Support of its Motion to Deny Petition to Quash IRS Summons Issued to Third Party Teva Neuroscience, Inc., and to Enforce, Chronic Disease Fund, Inc. v. United States, No. 2:17-cv-322 (W.D. Pa. May 18, 2017), ECF 13.

But for now, the key date is 2017.

That was when the IRS investigation pushed out into public view --- and when CDF sued in federal court to try to quash a summons that had been issued to Teva,[39] one of the "pharmaceutical

[38] See footnote 26.

[39] Recall that "the Defendant" is a shorthand here for both Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc. See footnote 5.

manufacturer 'donors'" that were "part of the 2011 [IRS] Examination." Id. at 1.

**a) Knowledge**

The CDF/Teva litigation and the facts around it were highly visible. They were covered, for instance, in numerous mainstream news sources.

- By Reuters, in a June 2017 article entitled "IRS probes drug company-funded patient assistance charity." Exhibit 12 to Bartle Declaration ("2017 Reuters Article") (ECF 158-12).
- By Bloomberg, in a June 2017 article called "Charity Funded by Drugmakers Draws IRS Probe on Tax Exemption." Exhibit 13 to Bartle Declaration ("2017 Bloomberg Article") (ECF 158-13).
- And by Politico, in a July 2017 newsletter with the following highlight: "Catching Our Attention: IRS Investigates Co-Pay Assistance Charity." Exhibit 18 to Bartle Declaration ("2017 Politico Newsletter") (ECF 158-18).

The IRS litigation was also covered in more specialized publications.

In a pharmaceutical trade-industry publication. See Exhibit 14 to Bartle Declaration ("2017 FiercePharma Article") (ECF 158-14) (an article entitled "IRS investigates patient charity as a possible 'conduit' for Big Pharma sales").

In the legal trades. See Exhibit 15 to Bartle Declaration ("March 2017 Law360 Article") (ECF 158-15) (an article entitled "Nonprofit Rips IRS' Teva Summons in Donation-Benefit Probe"); Exhibit 16 to Bartle Declaration ("May 2017 Law360 Article") (ECF 158-16) (an article entitled "IRS Looks to Enforce Teva Summons in Charity Inquiry").

And in trade-industry publications for non-profits. See Exhibit 17 to Bartle Declaration ("2017 Non Profit Pro Article") (ECF 158-17) (an article entitled "IRS Investigating Charity Funded by Pharma Companies: Where Are the Funds Really Going?"); Exhibit 19 to Bartle Declaration ("2017 Nonprofit Quarterly Article") (ECF 158-19) (an article entitled "IRS Investigating 'Patient Assistance Charity' and Donors for Possible Self-Dealing").

* * *

For storm warnings purposes, should the Plaintiff here be charged with knowledge of the IRS litigation?

"Yes," the Court concludes. Walk through three reasons why.

* * *

First, the caselaw.

In a storm-warnings case, the Third Circuit has indicated that as to everyday retail investors who buy a stock and hold it directly --- they should be taken to know what is said about the relevant company in the newspapers. See Benak, 435 F.3d at 401-02. Indeed, under Third Circuit storm-warnings law, retail investors are even expected to know about fairly generic in-the-newspapers information about the kind of stock they are invested in. See DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 217-18 (3d Cir. 2007).

If retail investors are required (on pain of a time-bar) to keep an eye on the news --- why not the Plaintiff here?

* * *

Second, there is special reason to charge the Plaintiff in this case with knowledge.

The Plaintiff is a very large, sophisticated insurance company. See Part II.B. And in the storm warnings context, the Third Circuit has indicated that sophisticated companies can be expected to keep track of highly visible public information --- sustained news coverage, for example, and federal regulatory activities. See, e.g., Prudential, 359 F.3d at 230-31, 236 (holding that a large insurance company was expected to pay attention to public reports about asbestos).

And here, there is no need to lean too heavily on any sort of inference --- because there is affirmative proof that the Plaintiff and its affiliates in this case systematically gathered and followed relevant news.

In June 2017, for example, two of the Plaintiffs' senior employees[40] received a "FiercePharma" newsletter in their email

[40] A member of the Plaintiff's pharmaceutical manufacturer contracting team (John Mbagwu), and its Director of Clinical and Specialty Pharmacy (Mark Godwin). See Exhibit 198 to Bartle

inboxes. The newsletter's #2 "top stor[y]" was the June 2017 FiercePharma article, mentioned above, entitled "IRS investigates patient charity as a possible conduit for Big Pharma sales." See Exhibit 227 to Bartle Declaration (ECF 160-30) at 5; Exhibit 228 to Bartle Declaration (ECF 160-31) at 3.

The article stated that the IRS was investigating CDF "to see whether the group [was] acting as a 'conduit' for the drug industry to boost sales." 2017 FiercePharma Article at 3. And it explained that in relevant court filings, "U.S. attorneys wrote that the IRS investigation centers on whether CDF 'is providing pharmaceutical manufacturer 'donors' an impermissible private benefit by returning almost all of their 'donated' funds to them as payments for their own drugs." Id. It also noted that "Teva . . . ha[d] been summoned in the matter." Id.

Another example.

On June 30, 2017, two seemingly senior employees of the Plaintiff[41] were also emailed a newsletter from the Academy of Managed Care Pharmacy, which included the following headline: "IRS Investigates Whether Patient-Assistance Charity Improperly Benefited Pharmaceutical Companies." Exhibit 229 to Bartle Declaration (ECF 160-32) at 4; Exhibit 230 to Bartle Declaration (ECF 160-33) at 4. This newsletter referenced the Reuters article cited above ("IRS probes drug company-funded patient assistance charity") and the Bloomberg article ("Charity Funded

---

Declaration ("Godwin Deposition") (ECF 160-3) at 13:7-15, 14:17-15:1, 34:21-35:3, 85:7-10; cf. United Healthcare Services, Inc.'s Response to Teva's Statement of Allegedly Undisputed Material Facts ("Plaintiff's SOMF") (ECF 163-1) ¶ 257 (admitting that Mbagwu was a member of the relevant team, but also noting that the record does not contain details as to Mbagwu's specific responsibilities); id. ¶ 184 (not disputing Godwin's position).

[41] The Plaintiff's Chief Pharmacy Officer (Susan Maddux), and an employee with responsibility for Part D plans (Michael Anderson). See Godwin Deposition at 14:7–11, 17:1–18:6; cf. Plaintiff's SOMF ¶ 183 (agreeing that Maddux was Chief Pharmacy Officer, but asserting that her work covered commercial health plans rather than Medicare plans); id. ¶ 273 (flagging that Mr. Godwin's testimony does not establish Anderson's title with certainty during the relevant time period). Maddox forwarded the newsletter to Godwin and others who worked for the Plaintiff. See Exhibit 230 to Bartle Declaration (ECF 157-230).

by Drugmakers Draws IRS Probe on Tax Exemption"). See id.; see also 2017 Reuters Article; 2017 Bloomberg Article.

That same day, three people affiliated with the Plaintiff[42] also received a newsletter that featured, among other things, a story with the header "IRS investigates copay charity, drugmakers." See Exhibit 231 to Bartle Declaration ECF 160-34) at 2; Exhibit 232 to Bartle Declaration (ECF 160-35) at 2; Exhibit 233 to Bartle Declaration (ECF 160-36) at 2.

This newsletter noted that IRS summonses were sent to Teva "regarding [its] donations to [CDF]," and it included a link to the Reuters article noted above ("IRS probes drug company-funded patient assistance charity"). See id.; see also Exhibit 234 to Bartle Declaration (ECF 160-37) (showing that one of the Plaintiff's executives received a nearly identical newsletter from the National Association of Specialty Pharmacy, which stated that the IRS sent an "inquir[y] . . . to Teva . . .

---

[42] The Plaintiff's Director of Clinical and Specialty Pharmacy (Mark Godwin), plus Optum's Senior Vice President (and later CEO) of Specialty Pharmacy (Michael Zeglinski), and another Vice President at Optum's (Matthew Vesledahl). See footnote 40 (discussing Godwin); Defendants' SOMF ¶ 303 (alleging Vesledahl was Optum's Senior VP of Network Pricing, Strategy, and analysis); Plaintiff's SOMF ¶ 302 (alleging that he was Senior Vice President for Pharmacy Economics, Client & Pharmacy Reconciliations, Margin Optimization, Affordability & Network Operations); Exhibit 196 to Bartle Declaration ("Zeglinski Deposition") at 61:22-62:9; Plaintiff's SOMF ¶ 201. Optum is a subsidiary of the defendant. See Exhibit 187 to Bartle Declaration (ECF 159-87) at 6. The parties dispute whether the knowledge of certain Optum employees can be imputed to the Plaintiff. Compare Plaintiff's Brief at 17-18, with Defendant's Brief at 14-18; Defendant's Reply at 9-10. But that issue need not be taken on here. The point is only this: the evidence suggests that the Plaintiff had some actual knowledge based on the information its senior employees had --- and that inference is strengthened by the undisputed evidence that employees of the Plaintiff's subsidiary (Optum) had similar information. Information as to the 2017 litigation was not only in the hands of the Plaintiff --- it was also in its immediate orbit, in the hands of its subsidiary.

regarding [its] donations to [CDF]" and attached the June 2017 Reuters article).

In sum: under Third Circuit law, it can be taken as a given that a large and sophisticated company was following relevant news, like the IRS litigation --- and here there is little reason to rest only on that background given, because there is evidence that some of the Plaintiff's senior employees were aware of the litigation.

* * *

Third, the 2017 Teva litigation was all but unmissable.

It was big news. Covered in many publications, and covered in many different kinds of publications --- all as noted above.

And the 2017 Teva litigation would have been (or at least should have been) especially big news within the insurance world.

Insurance companies sign on to pay for drugs that doctors prescribe. And for years, prominent newspapers had suggested that drug prices were being greatly inflated by drugmaker payments to charity co-pays. See Part III.A.2. In one case, nearly 15-fold. See 2013 Barron's Article at 4 (describing an increase in price from $1,650 to $23,000). And in another, around 55-fold. See 2015 LA Times Article at 2 (describing an increase from $13.50 to $750). These imply very large swings of money. That concentrates the mind, and means that insurance companies would have been (or at least should have been) closely focused on new developments related to patient-assistance programs and drugmaker donations to them.[43]

In addition, and as shown by the relevant newspaper articles, the practice of drug companies funding co-pay charities had for years grabbed the attention of insurers. Insurers had strong

[43] The newspaper articles here are not taken as proof that drug prices moved in certain amounts for certain reasons. That would likely make them inadmissible hearsay. Rather, the articles are used here to show that prices were broadly understood by insurers to move in those ways and for those reasons. That was the industry's general state of mind --- and given that pre-existing state of mind, the 2017 litigation would have been or should have been of especially pointed interest. Cf. Fed. R. Evid. 803(3) (noting that a "statement of the declarant's then existing state of mind" is not hearsay).

opinions about it --- they were said to "dislike" and "detest" such arrangements. See 2015 LA Times Article at 2-3.

Given this already-existing state of mind, the newest turn in the drugmaker/charity co-pay saga would have been (or at least should have been) a major focus for any large insurer --- something to follow closely, and to dig into.

And especially given the substance of the reporting.

The reporting on the 2017 litigation did not suggest incremental developments, a bit more of the same. Rather, the public reporting suggested genuinely new and qualitatively distinct happenings. That federal officials were investigating broadly, running down arrangements between a number of drugmakers and co-pay charities.[44] And that serious wrongdoing was possibly afoot.[45]

---

[44] Around the same time, there was litigation as to similar summonses issued to five other pharmaceutical manufacturers that, per the IRS, may may have been using the same charity (again, Chronic Disease Fund) as an improper conduit for donations to cover co-pays of patients taking the manufacturers' drugs. See, e.g., Petition to Quash IRS Summons Issued to Third-Party Genentech, Inc., Chronic Disease Fund v. United States, No. 3:17-cv-721 (N.D. Cal. Feb. 13, 2017), ECF 1 (Genentech); Verified Petition to Quash IRS Summons Issued to Third Party Novartis Pharmaceuticals Corporation Chronic Disease Fund v. United States, No. 2:17-cv-942 (D.N.J. Feb. 13, 2017), ECF 1 (Novartis); Verified Petition to Quash IRS Summons Issued to Third Party Johnson & Johnson, Chronic Disease Fund v. United States, No. 2:17-cv-1082 (D.N.J. Feb. 16, 2017), ECF 1 (Johnson & Johnson); Petition to Quash IRS Summons Issued to Third Party Bayer Healthcare Pharmaceuticals, Chronic Disease Fund v. United States, No. 2:17-cv-304 (W.D. Pa. Mar. 6, 2017), ECF 1 (Bayer). For public reporting on all this, see, e.g., 2017 Reuters Article at 2 ("The IRS sent summonses to Novartis AG, Roche Holding AG's Genentech unit, Johnson & Johnson, Bayer AG, Teva Pharmaceutical Industries Ltd and Biogen Inc seeking information about donations to Good Days, court papers show.").

[45] See, e.g., 2017 Reuters Article at 2 (reporting that the IRS "is probing whether a patient-assistance charity wrongly gave a benefit to its pharmaceutical company donors," and that "[d]rug companies are prohibited from subsidizing co-payments for patients enrolled in government healthcare programs like Medicare") (emphasis added); 2017 Bloomberg Article at 2

* * *

Bottom line: the Plaintiff here should have been aware of the 2017 IRS investigation, and the public information it spun off. Given the Plaintiff's size and sophistication. Given the ubiquity of public news coverage of the 2017 investigation. Given the evidence that the Plaintiff was affirmatively aware of the investigation. And given insurers' pre-existing concerns in this area --- and the eye-catching information associated with the investigation.

**b) Substance**

Having established that the Plaintiff can be charged with knowledge of the 2017 IRS litigation, come back now to the question on the table: has the Defendant carried its burden on the second part of the "source" inquiry --- the inquiry into identity, into knowledge of who was allegedly injuring the Plaintiff in the way it would later allege in this lawsuit.

The Court's conclusion: the Defendant has met its burden.

Powerful storm warnings as to identity flowed from what the Plaintiff should have known about the 2017 IRS investigation.

Public coverage of the investigation strongly suggested that (i) Teva was (ii) covering patient co-pays (iii) through the CDF charity.

Numerous published news reports mentioned these three facts. See June 2017 Reuters Article; June 2017 Bloomberg Article; June 2017 FiercePharma Article; March 2017 Law360 Article; May 2017 Law360 Article; June 2017 Non Profit Pro Article; July 2017 Politico Article; July 2017 Nonprofit Quarterly Article.

And that is, simply put, the core of the Plaintiff's theory in this case: that (i) the Defendant, (ii) was covering patient co-pays; (iii) through CDF.[46] See Complaint ¶¶ 3-4, 8-10, 12-14.

---

(reporting that the IRS alleged CDF was "serving as a conduit for its pharmaceutical manufacturer 'donors,'" and that it may be giving "impermissible" benefits to these donors); March 2017 Law360 Article at 2 (similar, describing the arrangement as "impermissible"); 2017 Non Profit Pro Article at 3 (same).

[46] Plus one other charity. See Complaint ¶ 3 (alleging that Teva conspired with "two purportedly independent charities,

To be sure, the Plaintiff's theory here is that Teva was funding charity co-pays in connection with one specific MS drug: Copaxone.

But the Copaxone connection should have been unmissable for the Plaintiff, too.

Several newspaper articles on the 2017 IRS investigation moved the needle in that direction. See Exhibit 5 to Bartle Declaration ("2010 Washington Post Article") (ECF 158-5) at 2 ("Without the help from [The Assistance Fund], she would not be able to afford the MS drug Copaxone."); see 2017 Bloomberg Article at 1 (explaining that the IRS "opened a probe" into a charity "funded by pharmaceutical companies[ that] . . . help[s] patients buy expensive drugs for . . . multiple sclerosis[] and other diseases," and noting that "Teva" was one of the companies issued a summons in connection with this investigation); Exhibit 97 to Bartle Declaration ("2017 STAT+ Article") (ECF 158-97) at 2 (noting that "Democratic lawmakers are pressing major pharmaceutical companies [including Teva] to explain their pricing strategies for multiple sclerosis drugs," and that as part of this investigation, they "asked for information about . . . patient assistance programs").

* * *

A storm warning can be "any information or accumulation of data 'that would alert a reasonable person,'" Cetel, 460 F.3d at 507 (quoting Mathews, 260 F.3d at 252), to the "possibility" of the relevant injurious activity. In re Merck, 543 F.3d at 164. Something that would allow "a reasonable [plaintiff] of ordinary intelligence" to "discover[] the information and recognize[] it as a storm warning.'" Mathews, 260 F.3d at 252.

The just-cited test may well have been met in this case, just by the news reporting on the 2017 IRS litigation collected above.

But there is no need to leave it there.

---

Chronic Disease Foundation ("CDF") and The Assistance Fund Inc. ("TAF")).

There was further and more specific information. Look to the publicly-available court filings associated with the 2017 federal litigation.[47]

These included a written donation agreement between the Defendant[48] and CDF. See Exhibit 8 to Bartle Declaration ("Teva-CDF Donation Agreement") (ECF 158-8) at 19-36.

And the agreement was crystal clear.

Per the agreement, CDF was helping to cover patients' Copaxone bills by taking care of things like co-pays. See Teva-CDF Donation Agreement ¶ 1 ("[CDF] has an assistance program for patients being treated . . . with Copaxone who meet certain financial and medical criteria[,] . . . which may include assistance paying or reimbursing such patients' co-payments and co-insurance for that drug").

And in this endeavor, which focused wholly on Copaxone, see id., the money flow was laid out in black and white --- CDF was funded with Teva donations. See id. at 18, ¶ 4(a) (agreeing that Teva "shall endeavor to provide the Foundation with funding to support the Foundation's mission of providing co-payment and co-insurance assistance to patients meeting the Program's objective financial eligibility criteria, so that such patients may obtain Copaxone therapy[.]"); id. ¶ 5 ("The Foundation will use the Donation for purposes of administering the Program and providing financial assistance to eligible patients who are receiving Copaxone therapy[.]").

Moreover, the agreement set things up to ensure that the Defendant could actively monitor the precise impact its donations were having on Copaxone use. See, e.g., id. at 24, ¶ 11(b) ("The Foundation will make available to Donor weekly

---

[47] Courts have considered publicly-available court filings to be a basis for storm warnings --- even when those filings are made in cases to which the plaintiff was not a party. Cf., e.g., In re Celexa & Lexapro Mktg. & Sales Pracs. Litig., 915 F.3d 1, 14-16 (1st Cir. 2019); Koch v. Christie's International, 699 F.3d 141, 153 (3d Cir. 2012); Benak, 435 F.3d at 402 & n.15.

[48] Strictly, one of the defendants here, Teva Neuroscience, Inc. See Exhibit 8 (Teva-CDF Donation Agreement) at 18; footnote 5; Complaint ¶ 19.

status reports that track the status of applicants to the Program up to and including the first time that Copaxone is dispensed to such participant and monthly patient-level dispense data"); id. ¶ 11(c) ("The Foundation will submit monthly reports . . . to Donor [including] (i) [the n]umber of applications received [and accepted] to the program . . . [,] (iv) [the a]verage amount paid to recipients in the program for cost sharing obligations . . . [,] (v) [the t]otal amount paid out by the Program . . . [, and] (vi) [the t]otal amount allocated to enrolled patients in the Program but not yet paid out.").

All of this was plainspoken and public. And all of it explicitly described --- before the 2018 storm-warnings cut-off date --- what the Plaintiff would allege years later, when it filed this lawsuit. Namely, that Teva was making payments to CDF, and that CDF was then turning around and covering Copaxone co-pays.

As noted above, a storm warning can be "any information or accumulation of data 'that would alert a reasonable person,'" Cetel, 460 F.3d at 507 (quoting Mathews, 260 F.3d at 252, to the "possibility" of injurious activity, In re Merck, 543 F.3d at 164, and that would allow "a reasonable [plaintiff] of ordinary intelligence" to "discover[] the information and recognize[] it as a storm warning.'" Mathews, 260 F.3d at 252

As to the Teva/CDF agreement, there is no need to squint hard to catch its meaning. It does not tip-toe around the relevant issue, or allude to it in an elliptical way. The agreement is explicit. There is no rock to overturn. Nothing much to "discover," nothing hard to "recognize."

If anything, the opposite. The Teva/CDF agreement veers close to being direct and public confirmation --- well before the key storm warnings date --- that there was a "possibility," In re Merck, 543 F.3d at 164, that the Defendant was doing exactly what the Plaintiff would later sue it for.[49]

---

[49] The Plaintiff alleges that the Defendant made donations not only through CDF, but also via The Assistance Fund. See Complaint ¶ 3. But the Plaintiff does not press any argument here that seeks to differentiate between the two --- that aims to suggest that even if there were storm warnings related to Teva/CDF, there were not sufficient ones as to Teva/TAF. Nor would that argument hold up. For the purposes of getting going

### 2. The Teva Executive's Statement

Focus now on another piece of the storm warnings picture --- a 2005 Wall Street Journal article. See Exhibit 20 to Bartle Declaration ("2005 WSJ Article") (ECF 158-20).

#### a) Knowledge

For storm warnings purposes, should the Plaintiff have known about the 2005 Journal article? Again, yes. Three reasons why.

* * *

First, for the various reasons discussed just above, including the Plaintiff's sophistication and the insurance industry's focus on the relevant cluster of issues. See Part III.B.1.

* * *

Second, because of certain aspects of the article itself.

For the Plaintiff, the article would have (or should have) stood out.

It came out in the Journal, which was one of the most popular newspapers in the United States as of 2005,[50] and a go-to, must-read for business leaders.[51]

---

with next steps, like a Teva-focused investigation --- nothing turned on which charity the Defendant may have been using. Moreover, as the next section shows, the long-standing public information that the Defendant was funding patient assistance charities was not somehow limited to the idea that it was funding CDF specifically. See Exhibit 20 to Bartle Declaration ("2005 WSJ Article") (ECF 158-20) (discussing patient financial assistance programs generally, and noting as two examples "Patient Services" and "the National Organization for Rare Disorders"); see also 2010 Washington Post Article (discussing the launch of TAF, and noting that "[w]ithout the help from [The Assistance Fund], [a patient] would not be able to afford the MS drug Copaxone").

[50] See Top 100 Daily Newspapers in the U.S. by Circulation (2005), Burrelles Luce; see also footnotes 32, 34.

[51] The Plaintiff, as noted, is a large insurance company. See Complaint ¶¶ 47-49.

Moreover, the article's title marked out its subject as one that would be especially interesting to an insurance company: "Through Charities, Drug Makers Help People --- and Themselves." 2010 Washington Post Article at 2. The sub-heading: "By Donating Money, Firms Keep Patients Insured and Medicine Prices High." Id.

And the story was no needle in a haystack.

It was long, coming in at more than 3000 words. It seemed encyclopedic. Deeply-reported, well-sourced. The kind of piece that gets read closely and passed around by people whose work touches on the relevant subjects.

And the article seemed designed to stand out. It included two illustrations, plus a color chart that showed the "[c]overage [c]ycle," id. at 7, for drugmaker donations to patient charities --- with three nodes for each of the major players in this case: "Drug companies," "Charities," and "Insurers." Id.

* * *

Third, even if the Plaintiff should not have been aware of the WSJ article when it came out in 2005, the Plaintiff should have become aware of it later.

After years of cascading industry focus on drugmaker payments to co-pay charities, see Part III.A.2, and after the 2017 revelations associated with the IRS investigation, see Part III.B.1 --- a sophisticated insurer would have done at least a small look-back to major public sources of information, such that it would have become aware of the 2005 Wall Street Journal article.

For storm warnings purposes, retail investors are expected, when they see unfavorable news in the papers about their stocks, to "return" to other information, even if they had never previously seen it. See DeBenedictis, 492 F.3d at 219.

And so too with sophisticated entities.

To see the point, look to Prudential Insurance Co. of America v. United States Gypsum Co., 359 F.3d 226 (3d Cir. 2004). There, a plaintiff/insurance company argued that it only began to appreciate the hazards associated with in-place asbestos in 1984, when it had to remove asbestos-containing materials ("ACMs") from one of its properties. See id. at 229. But beginning in 1973, the EPA established guidelines and standards

for asbestos management. See id. at 229-30, 234-35. The Plaintiff tried to argue that these "pre-1984 government regulations and information were not directly related to in-place ACMs," and so could not serve as storm warnings of their asserted injury. Id. at 235.

But the Third Circuit turned this aside.

Even if "Prudential was not aware of the EPA's repeated warnings about the potential hazards of in-place asbestos," the Court made clear that later events --- in the late 1970s and early 1980s --- "should have triggered Prudential's inquiry into the hazards posed by asbestos." See id. at 235-36.

In short, after important later-in-time events, Prudential (a sophisticated insurer) was charged with knowledge of highly-visible public information that a modest look-back would have turned up.

And that is this case.

Given the newspaper reporting of the 2010s, and the IRS investigation of 2017 --- peering back in time a bit for relevant information was what a "reasonable" company would be expected to do. Cetel, 460 F.3d at 507.

* * *

Bottom line: by the time of the storm warnings cut-off in 2018, the Plaintiff should have known of the 2005 Wall Street Journal article.

**b) Substance**

What did the Journal article say?

It described the donations to co-pay charities by particular drug companies. See 2005 Wall Street Journal Article at 2-3. And it named a Teva entity, stating that "Teva Pharmaceutical Industries Ltd., . . . donate[s] to these [charity] programs." Id. at 5.

The article also included this:

> Teva Neuroscience Inc. markets a multiple sclerosis drug that retails for about $18,000 annually. "Market research told us early on we needed to do a patient-support program" because some people wouldn't be able to afford their co-payments, says

> Denise Lynch, director of customer management. Teva donates to the National Organization for Rare Disorders to provide co-payment assistance. Ms. Lynch says Teva didn't calculate the profit it could receive when making its donation, "but from a common-sense perspective, you can get there."

Id. at 9.[52]

As noted, the Plaintiff's basic contention in this case is that the Defendant paid money to charities to help cover Copaxone co-pays, and that those payments harmed the Plaintiff. See Part I.A.

The block quote touches on virtually all of this. And it does so explicitly, publicly, and on the authority of a seemingly senior Teva executive, the "director of customer management." 2005 Wall Street Journal Article at 9.

The quote touches on donations by Teva to a charity that covered patient co-pays. See id. This, nearly 20 years later, would become a key part of the Plaintiff's legal theory in this lawsuit. See Complaint ¶¶ 230-31, 240-41.

The quote also touches on the fact that the donations made by Teva were profitable for it --- and obviously so. Indeed, there was no need for Teva to "calculate the profit" associated with making charity donations. 2005 Wall Street Journal Article at 9. Research had shown that "people wouldn't be able to afford their co-payments." Id. So making donations to help with co-pays would plainly be worth it, "from a common-sense perspective." Id. (cleaned up).

This, too, would become a key aspect of the Plaintiff's theory in this lawsuit --- which rests on the idea that the Defendant profited through extra drug costs, and that those costs amounted to an injury to the Plaintiff. See Complaint ¶¶ 230-31, 240-41.

Finally, the 2005 Wall Street Journal article mentioned that charity donations were made in connection with a "multiple

---

[52] See also 2005 Wall Street Journal Article at 10 (quoting a charity executive as saying: "You could see the dollar signs shining in [drug-company executives'] eyes" after they learned about the possibility of making these donations and stating that "they would jump over the table and say, 'When can I start?'").

sclerosis drug" that Teva "markets." 2005 Wall Street Journal Article at 9.

There is every reason to think that sophisticated insurance-industry readers would have understood (or should have understood) this as a likely reference to Copaxone.

After all, Copaxone is a "multiple sclerosis drug." It is made by Teva. And the drug that was focused on in the article was said to cost "about" $18,000 per year as of 2005. Id. (The Plaintiff has indicated in this litigation that "the price of Copaxone . . . [was] roughly $17,000" in 2006. Complaint ¶ 2.)

In short, 13 years before the storm warnings cut-off, the 2005 Journal article veered close to a public announcement that Teva was funding co-pay charities as to Copaxone. And that, in essence, is what the Plaintiff alleged here --- when it filed this lawsuit in 2022.

### C. Case Law

Take stock for a moment.

The dividing line for the RICO claims is November 2018.

Before November 2018, there were storm warnings as to injury. See Part II.B.

And as to source: storm warnings, too.

From common sense and from news articles --- it was clear that drug prices and prescription volumes could well go up if drugmaker-funded charities covered co-pays. The heads-up as to causation was out there for the hearing. See Part III.A.

And as to identity, knowledge of who might potentially be sued, the Plaintiff should have perceived strong storm warnings. From public materials associated with the 2017 IRS litigation, plus the 2005 statement made in the Wall Street Journal by a Teva executive.

Together, these explicitly ran through the allegations at the heart of this lawsuit.

That one of the drugmakers funding a co-pay charity was Teva. That Teva was making those sorts of payments in connection with Copaxone. And that CDF was being used by Teva as a conduit for such donations. See Part III.B.

In short, by the November 2018 cut-off, the Defendant has shown that there were powerful storm warnings in the air. And not just any storm warnings. Virtually unmissable ones. So unmissable that a reasonable jury could come to only this conclusion: to the extent the RICO claims here rest on the volume theory or the price theory, they are time-barred.

This conclusion is backed up by relevant Third Circuit caselaw. Work through it now, starting just below.[53]

---

[53] Many of the cases discussed below concern securities fraud. And there can sometimes be a difference between the storm warnings measure for securities fraud claims and for RICO claims. As to securities fraud claims, the storm warnings barometer is generally keyed to the defendant's actions. And for RICO claims, the barometer is locked on to the plaintiff's injuries. See Mathews, 260 F.3d at 251 (discussing this). Does this mean that securities-fraud cases should be out of bounds here? No. First, courts routinely reason across doctrinal areas, accounting in the analysis for any meaningful differences between them. Second, to sidestep the question of injury alone versus injury and source, the Court here has undertaken the more plaintiff-friendly injury-and-source approach. See footnote 14. Adding in consideration of the "source" element, as the Court has done, triggers a look to knowledge of the actions of the defendant that would later be sued. See id. And this focus on the defendant closes up some of the daylight that might otherwise have existed between RICO and securities fraud. That is, RICO storm warnings, as analyzed in this Opinion and Order, work a bit like securities fraud storm warnings --- both turn in part on what the plaintiff knew or should have known about the defendant's actions. Third, any delta that might generally exist between securities fraud cases and RICO cases is "insignificant" where the RICO claim is rooted in fraud allegations --- "because the fraud and injury" in those sorts of RICO cases typically "occur[] at approximately the same time[.]" Mathews, 260 F.3d at 251. That, to an extent, is this case. Allegations of fraud and misrepresentation do not undergird the price or volume theories. But the Defendant's alleged conduct (funding co-pay charities as to Copaxone) is said to have caused injury to the Plaintiff (more Copaxone payments) at roughly the same time that the conduct took place. There is no reason to think there was any long time-lag between the two. Accordingly, any difference that might otherwise exist between securities fraud cases (in general) and this RICO case (in particular) is not especially "[]significant" here. Id.

### 1. DeBenedictis

The stepping-off point is DeBenedictis v. Merrill Lynch & Co., 492 F.3d 209 (3d Cir. 2007).

There, investors claimed that Merrill Lynch's registration statements had angled them into buying "class B shares" --- even though those sorts of shares were not a good investment, and even as Merrill brokers got larger commissions when they sold them. See id. at 210.

The Third Circuit held that the claims were time barred, based on two categories of storm warnings.

First, newspaper articles and press releases. Those worked as storm warnings even though they reported on class B risks in general or as they related to other companies --- all without specific reference to Merrill Lynch. See id. at 217-18.[54]

And second, the Merrill registration statements. These described the fee structure for class B and other shares. See id. at 216. Based on this information, the Third Circuit concluded that investors could be expected to reason through which shares were good investments, and which were not. See id. at 216-17. In light of the registration statements, investors "could calculate on their own whether one class of shares [was] more attractive than another." Id. at 216.

"Even if a mutual fund investor failed to read the Registration Statements when they were initially received and failed to run any independent calculations of the fees that would be incurred

---

[54] The articles were from popular magazines and newspapers. See DeBenedictis, 492 F.3d at 214 (discussing articles published in Time Magazine, USA Today, and the Wall Street Journal). As indicated in the text, they discussed class B shares, without picking out Merril in particular. See id. (noting that one newspaper article reported, in general, that "brokers can get bigger commissions selling B shares") (cleaned up). And they suggested that there were possible downsides associated with investors going the route of class B shares, but not that such shares were always a bad call. See id. (quoting articles as indicating that "B shares also typically mean lower performance," warning investors to "make sure [purchasing such shares is] in your best interest, not just [the brokers]," and as advising that "[i]n most cases, it's better for the client economically" to buy other shares) (emphasis added)(cleaned up).

on Class B shares," the Third Circuit noted, "the news articles questioning the profitability of such shares and highlighting the possible conflict of interest would urge the reasonable investor to return to the Registration Statements in order to evaluate the profitability of his or her own investments and investigate their broker's conflict of interest." Id. at 219.

* * *

In DeBenedictis, the Third Circuit held that (i) news coverage should have (ii) "urge[d]" investors to work through easily-accessible information (the registration statements) and to do some analysis of that information,[55] which would have provided a storm warning as to the claims the investors later pressed.[56]

In this case, each part of the (i)/(ii) equation weighs more strongly in favor of applying a time bar than it did in DeBenedictis.

* * *

As to (i), the plaintiffs in DeBenedictis were expected to know which way the wind was blowing from fairly generic newspaper articles, ones that did not mention Merrill.

---

[55] "[I]ndependent calculations," to "evaluate" the numbers and to "investigate" a broker's possible conflicts of interest. Id.

[56] Note that DeBenedictis can be read to suggest that (i) was enough, that extensive newspaper coverage --- even standing alone --- added up to storm warnings in that case. Just after noting that the plaintiff had argued that "the public documents [in that case] did not put him on inquiry notice of his claims because they failed to mention [the defendant] and, in one case, painted [the defendant] in a positive light," DeBenedictis, 492 F.3d at 217, the DeBenedictis court stated that "the articles in USA Today, Time Magazine, the Wall Street Journal, and NASD press releases were sufficient to place a reasonable investor of ordinary intelligence on inquiry notice." Id. This statement was made in its own section of the opinion, separate from the court's discussion of the registration statements. See id. at 216-17. It suggests the possibility that the newspaper articles, by themselves, were sufficient storm warnings --- even without the picture being filled out some more by the registration statements, and even as the articles were in no way specific to the defendant, Merrill.

Here, there was also a deluge of newspaper articles --- that spoke to the potential risks to insurance companies posed by pharmaceutical companies funding co-pay charities. See Part III.A.2.

If the retail-investors in DeBenedictis could be charged with knowing what was in the news, then there is a stronger case for the Plaintiff here to be charged with knowing what was in the news. After all, the Plaintiff here is a sophisticated company. See Complaint ¶ 49; Prudential, 359 F.3d at 234 (indicating that this matters for the storm-warning analysis). And one that affirmatively followed the news as it related to its business. See Part III.B.1.

* * *

As to (ii), the DeBenedictis Court concluded that the plaintiffs should have been pushed back to their already-in-hand information by news reports --- and once they were, to begin doing some "calculations" based on that information and to "investigate." See 492 F.3d at 219.

In this case, the Plaintiff's in-hand information should have made things clearer than that.

The evidence here is that senior employees of the Plaintiff were aware of the 2017 IRS case. See Part III.B.1. And understanding the import of that information did not require any inference. There was no need to sit down for "calculations," or to conduct an "investigat[ion]." DeBenedictis, 492 F.3d at 219. The public information on the 2017 IRS case indicated that, as to Copaxone, Teva was funding co-pay charities. See Part III.B.1. And the information was direct and explicit. No poking around required, nothing complicated to work through, no extra analytic step needed to piece things together.[57]

* * *

[57] The Plaintiff in this case was also sure to have additional in-hand information, as to how often it was prescribing Copaxone and what Copaxone was costing. If prescription volumes or prices were nudging up --- that would have been straightforward to see, again without the need for any complicated "calculations." See footnote 22.

In short: there were sufficient storm warnings in DeBenedictis, so the storm warnings here must have been sufficient, too.

### 2. Mathews

Move now to Mathews v. Kidder, Peabody & Co., 260 F.3d 239 (3d Cir. 2001).

There, the investor-plaintiffs claimed that the defendants had fraudulently misrepresented certain securities as "low risk, conservative" investments "similar to municipal bonds." Id. at 241-42

The Third Circuit held that the claims were time-barred, see id. at 255, because there were early-enough storm warnings. See id. at 252-55.

Not from the securities prospectus --- because it only laid out a generic "laundry list[]" of risks, the sort that are spotlighted in connection with many investments. See id. at 253. There was "nothing in the prospectus to suggest that the funds [at issue were] especially risky or inappropriate for conservative investors." Id.

But the "financial updates [were] a different matter."[58] Id. They showed that the fund distributions had fallen 66% during one quarter, and 75% in another one-year period. See id. at 253-54. "[T]his sort of volatility," per the Mathews Court, was "simply inconsistent with a conservative investment vehicle similar to municipal bonds." Id. at 254 (emphasis in original). From this volatility, the plaintiffs should have had a sense that they were invested in a not-so-conservative fund. See id. at 241-254

Baked into this conclusion is the idea that individual investors are not only responsible for looking at top-line financial information, but also for making some inferences based on the data. An investor is expected to say to herself: if my fund is this up-and-down, then it probably is not set up to be especially conservative.

But in this case things were easier than that. No inference needed. What the Defendant would later be sued on here was in

[58] These seem to have been the quarterly reports provided to investors by the defendant/brokerage. See Mathews, 260 F.3d at 241, 253-54.

its main outlines directly stated in 2005 and in 2017, well before the November 2018 storm warnings dividing line.

Moreover, the Plaintiff in this case is sophisticated. See Part II.B. Likely more so than the individual investors in Mathews. And the years of public focus, see Part III.A.2, on precisely the issue the Plaintiff would later sue on --- that should have raised pointed concerns, in ways that an off-the-rack "laundry list[]" never could.

* * *

A (i) "laundry list[]" of information, plus (ii) detailed information that required inference --- that was enough to put everyday investors on notice in Mathews.

So it follows that (i) years of more specific information, plus (ii) detailed information[59] that required no inference at all --- that should have been enough to storm-warn the sophisticated Plaintiff in this case.

### 3. Prudential

Now look to Prudential Insurance Co. of America v. U.S. Gypsum Co., 359 F.3d 226 (3d Cir. 2004), already discussed.

One of the plaintiffs there was an insurance company that owned and operated buildings with "asbestos-containing materials" or "ACMs." Id. at 228. It sued asbestos manufacturers, hoping "to recover the costs of monitoring and remediation" for the buildings. Id.

When should the insurer-plaintiff have known about the underlying claims? Not until late in the day, it argued. Per the insurer-plaintiff, "it only began to appreciate the hazards associated with [the ACMs in its buildings] at the time it had to remove [those materials] from one of its properties," in 1984. Id. at 229.

But the Third Circuit rejected this. "Asbestos had . . . already become a well-known and important public health and safety issue in the United States" well before 1984. Id. And "repeated [government] warnings about the potential hazards of .

[59] Materials associated with the 2017 litigation and Teva executive's statement in 2005.

. . asbestos . . . should have triggered Prudential's inquiry into the hazards posed." Id. at 236.

Moreover, before 1984, "various Prudential employees were aware of the existence of ACMs in at least some of Prudential's properties." Id. at 230. Even though these employees had stated that any asbestos-containing materials in the plaintiff's buildings "would not be hazardous," the Third Circuit still found it telling that asbestos was "a topic discussed," and that certain of the plaintiff's buildings had undergone asbestos testing. Id. at 230-31.

All of this added up to enough in the way of storm warnings, in part because the plaintiff-insurer was "one of the largest life, property, and casualty insurance underwriters in the world," id. at 229, and "a very sophisticated company." Id. at 234.

> Such a sizable business operation not only provided Prudential with more opportunities than an average plaintiff to access ACM-related information, but it should have also given Prudential a greater incentive to diligently research and investigate any potential injuries it may suffer through the presence of ACMs in its own properties. As the District Court correctly pointed out, because Prudential's liability exposure was magnified by the large size of its real estate portfolio, "prudence dictates that Prudential should have remained informed of its legal responsibilities."

Id. at 234-35.

* * *

In Prudential, the plaintiff was a large and sophisticated company. So it had "more opportunities than an average plaintiff to access [relevant] information," and "a greater incentive to diligently research and investigate any potential injuries it may suffer[.]" Id. at 234.

The same is true here.

In Prudential, background concerns with asbestos were well-known and widely reported on.

Again, the same is true here. Years of reporting spoke to drugmaker funding of co-pay charities and the impact of such payments on insurers. See Part III.A.2. This should have

grabbed the Plaintiff's attention, and put it on its guard as to the "possibility," In re Merck, 543 F.3d at 164, that those co-pays were injuring it.

In Prudential there was some pointed information that helped to push things across the line. Some employees had "discussed" ACMs, and some of the plaintiff's buildings had undergone asbestos testing. See 359 F.3d at 230.

So too here. In 2017, it became crystal clear that Teva was making payments to CDF for Copaxone co-pays. See Part III.B.1. And in 2005, there had been similar (and similarly explicit) information, too. See Part III.B.2.

* * *

Background information paired up with more direct information --- that added up to storm warnings in Prudential, especially given the sophistication of the plaintiff/insurance company.

And all of that describes this case, too.[60]

[60] Seeking to distinguish Prudential (and other cases), the Plaintiff contends that, in those cases, the plaintiffs had some "direct" storm warnings. United Healthcare Services, Inc.'s Response in Opposition to Teva's Motion for Summary Judgment on its Statute-of-Limitations Defense ("Plaintiff's Brief") (ECF 163) at 32-33. But just because "direct" information was part of one case does not mean that it needs to be there in every case. Indeed, if "direct" knowledge were always required, it is hard to know why our law would have a "should have known" standard. After all, that kicks in precisely because there is not direct evidence of knowledge. Moreover, in Prudential the Third Circuit emphasized that the insurer was "a very sophisticated company" that had "more opportunities than an average plaintiff to access [relevant] information" and "greater incentive to diligently research and investigate any potential injuries[.]" 359 F.3d at 234. This was relevant, in part, to the Circuit's decision to consider information the plaintiff was not necessarily directly given --- but that in light of its size and sophistication, it should have been aware of. In short, direct knowledge is not needed. (And in any event, note that the Plaintiff here does appear to have had at least some direct knowledge. Certain senior employees, for example, received information about the 2017 IRS lawsuit in newsletters. See Part III.B.1.)

### 4. Benak

Against the above, the Plaintiff presses a counterargument based on Benak ex rel Alliance Premier Growth Fund v. Alliance Capital Management L.P., 435 F.3d 396 (3d Cir. 2006).

In Benak, investors bought Enron stock and then sued when the company folded --- after a period in which it staggered badly and publicly, and then fell finally into collapse. See id. at 397-98.

The Benak Court suggested that there would have been storm warnings for people who bought Enron shares directly.

> Upon reading news reports regarding the financial woes of a particular company and speculation regarding the management of that company, a direct investor immediately has reason for concern. Moreover, in being responsible for his or her own investments, a direct investor has greater motivation --- and therefore, one would assume, be more likely --- to stay informed.

Id. at 401.

But per the Third Circuit, mutual fund investors were not to be held to this same standard. See id. at 402. Mutual funds are designed to allow investors to "pass along the responsibility for maintaining consistent knowledge" to someone else. Id. Indeed, fund investors "have little idea at any one time in what securities their money is invested," id. --- because they have offloaded things to the mutual fund company.

The Plaintiff here suggests that it is more like a mutual fund investor than a direct investor --- because it "does not directly or indirectly invest in Teva," and it "covers thousands of drugs on its formularies, made by numerous companies (including Teva), and Teva itself makes thousands of different kinds of drugs." United Healthcare Services, Inc.'s Response in Opposition to Teva's Motion for Summary Judgment on its Statute-of-Limitations Defense ("Plaintiff's Brief") (ECF 163) at 34.

But this does not work. Walk through three reasons why.

* * *

First, the evidence that a Benak counterargument might be based on is simply not there.

An investor cannot be treated as a mutual fund investor without some reason to think that that is what she in fact was. A homeowner might potentially try to argue "I didn't need to check whether the smoke might be fire because that was the alarm company's job." But only if he proves[61] that there was an alarm company covering his house in the first place.

Here, summary judgment has come and gone --- but the Plaintiff has not argued that it was, in fact, relying on another entity's judgment. There is no indication of any offloading by the Plaintiff. Nothing to suggest that it transferred responsibility to another entity, analogous to the way a retail investor might outsource some of the need to keep tabs on her portfolio to mutual fund pros.[62]

The Plaintiff "covers thousands of drugs on its formularies, made by numerous companies (including Teva), and Teva itself makes thousands of different kinds of drugs." Plaintiff's Brief at 34 (emphasis omitted).

Keeping on top of all this may well be difficult. And when individual investors experience comparable challenges --- of there being a lot to keep an eye on --- they might opt to turn to a mutual fund, as in Benak.

But that can have no bearing here. Because the Plaintiff has not argued that it did, in fact, look to a third-party for that sort of assistance.

* * *

Second, Benak is distinguishable.

A key question in this area of the law is whether a plaintiff should have had certain information. In Benak, for example, the investors argued that they did not actually follow their fund investments in a way that would have led them to know that they were invested in Enron. See 435 F.3d at 399, 402 ("[A]ppellants argue[d] . . . that they had no way of knowing what Alliance's Enron holdings were until they received [a certain] report [that

[61] Or alleges, depending on the stage of the case.

[62] The Plaintiff apparently hired a pharmacy benefits manager. See Defendants' Reply at 9. But its legal brief makes no argument as to any offloading to the PBM, let alone offloading that might be analogous to the way in which mutual fund managers work.

laid out the relevant specifics].”). So the question then became whether they should have been aware of their Enron exposure. See id. at 402

But the should-have-known question becomes relevant only if a plaintiff does not actually know.

And here, there is evidence that the Plaintiff’s employees did actually know about the 2017 IRS litigation. See Part III.B.1. And that litigation provided clear-as-a-bell storm warnings --- particularly when combined with the other information the Plaintiff had or should have had.

* * *

Third, the Benak analogy does not fit.

The Plaintiff is a very large company. See Complaint ¶ 49. Its size meant that it had more ground to cover --- “thousands of drugs,” Plaintiff’s Brief at 34 (emphasis omitted), to be alert to.

But that is no reason to draw an analogy to people like the retail investors in Benak.

Under Third Circuit precedent, described above in connection with Prudential, very large companies are charged with more knowledge than individual investors. See 359 F.3d at 234-35. There are greater resources to draw on. Economies of scale to take advantage of. Professionalized information-gathering systems to build and use. And as to an important issue like the one here --- where the complaint in this case seeks many millions in damages --- there is plenty of skin in the game. Per the Third Circuit, “sophisticated” companies can be taken as having “more opportunities than an average plaintiff to access . . . information,” and a “greater incentive to diligently research and investigate any potential injuries it may [have] suffer[ed.]” Prudential, 359 F.3d at 234 (emphasis added).

In short, a plaintiff’s size is a reason to be charged with knowing more, not less.

So the Benak analogy does not hold up. And neither does the Plaintiff’s counterargument which rests on it.[63]

[63] The Plaintiff also lightly references In re Merck & Co., Inc. Securities, Derivative & “ERISA” Litigation, 543 F.3d 150 (3d Cir. 2008). See Plaintiff’s Brief at 27. There, the court of

* * *

For the reasons set out in this Part III, to the extent that the Plaintiff's RICO claims are based on the volume theory or the price theory, the Court concludes that these claims are time-barred.

## IV. The Ineligible Patient Theory

To this point, the Court has focused on the volume theory and the price theory.

The Plaintiff's RICO claims rest on a third (and final) theory, too. Call this one the "ineligible patient theory."

The theory is this: "federal . . . law prohibit[s] pharmaceutical companies from paying the cost-sharing

---

appeals held that there were not adequate storm warnings as to the relevant defendant's mental state. See In re Merck, 543 F.3d at 172. Scientific studies, reports, and news articles suggested that the drug the company was selling may have been flawed. See id. at 154-60. And all of this might well have provided warnings that the drug was being marketed with scienter. But there were other ways to read those same reports, see id., and plenty of reports that ran the other way. See id. at 154-60, 172. Given these pushes and pulls, the Third Circuit held, it could not be said that there were storm warnings as a matter of law as to mental state. See id. at 172. But that is not this case. The storm warnings here flow from public information that was unequivocal. Information as to Teva from 2005 and 2017 pointed the needle in only one direction. And against the backdrop of reporting on the volume theory and the price theory that was not somehow ambivalent or all over the map. Another point on Merck. The court of appeals there held that the district court's storm-warnings holding improperly relied on an FDA letter that had been issued. See In re Merck, 543 F.3d at 169-71. That letter, the Third Circuit held, was too far afield. Its allegations as to wrongdoing related to advertising. See id. at 170. And these were not adjacent enough to the allegations of securities fraud that were at issue in Merck. See id. But the storm warning here was all but directly on point. For example, public filings from 2017 made it plain that Teva was funding CDF as to Copaxone co-pays. See Part III.B.2. And that is close to being a carbon copy of the Plaintiff's legal theory here --- even though it emerged in the context of a tax investigation.

obligations of their customers." Complaint ¶ 70. And healthcare claims are "not payable" by the Plaintiff if they were "tainted" by, among other things, "illegal . . . kickback[s]" of this kind. Id. ¶ 171. So some of the Plaintiff's Copaxone-related payouts did not need making --- because the Defendant was covering these patients' Copaxone co-pays (through charities, like CDF) and that violated the law, including the federal anti-kickback statute. See id. ¶¶ 9, 60, 171.

But the Court concludes that the Plaintiff's RICO claims are also time-barred to the extent they rest on this ineligible patient theory.

* * *

To see why, begin with the 2005 Department of Health and Human Services' Office of the Inspector General bulletin, published in the Federal Register. It described the sorts of pharmaceutical company/charity-donation agreements that could "raise . . . anti-kickback statute concerns." Exhibit 4 to Bartle Declaration ("2005 OIG Guidance") (ECF 158-4) at 5.

The guidance was not obscure. It was widely reported on.[64]

---

[64] See, e.g., Exhibit 21 to Bartle Declaration ("2006 NYT Article") at 3 ("Last year, the Office of the Inspector General for the federal Health and Human Services Department published guidelines [indicating that] drug companies [can] make donations to . . . co-pay charities, as long as the charities are independently run and make donations based on financial need and type of disease --- not for specific drugs."); 2013 Barron's Article at 5 ("In a 2005 advisory bulletin, the OIG warned co-pay charities against [certain conduct that would] result[] in the subsidization of the donor's particular products."); Exhibit 28 to Bartle Declaration ("2014 Law360 Article") at 2 ("In November 2005, the OIG issued a special advisory bulletin providing guidance on the application of fraud and abuse laws to PAPs. . . . "[T]he OIG was concerned that 'cost-sharing subsidies provided by pharmaceutical manufacturer PAPs pose a heightened risk of fraud and abuse under the Federal anti-kickback statute[]' . . . [and] "noted that if a manufacturer offered subsidies 'tied to the use of the manufacturer's products[,]' . . . those subsidies would present traditional fraud and abuse risks associated with kickbacks."); 2015 LA Times Article at 4 ("The Dept. of Health and Human Services has even warned that manufacturer subsidies to Medicare or Medicaid

And the OIG guidance made things clear: "few, if any, . . . concerns[] [would be raised] so long as[,]" among other things, "[t]he pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount of frequency of its donations with the number of subsidized prescriptions for its products." 2005 OIG Guidance at 5.

But --- and this is key --- "[r]eporting of data . . . would be problematic" to the extent it "related to the identity, amount, or nature of subsidized drugs." Id. at 5-6 n.16.[65]

* * *

Against the backdrop of the OIG guidance, the Court concludes that to the extent that the Plaintiff's RICO claims rest on the "ineligible patient theory" --- those claims are also time-barred.

The Plaintiff should have known about the various court filings associated with the 2017 IRS litigation for the reasons discussed at length in Part III.B.1.

patients may run afoul of federal anti-kickback laws[.]") (linking to the 2005 Bulletin); Exhibit 35 to Bartle Declaration ("2015 WSJ Article") at 4 ("'We are concerned about the use of cost-sharing subsidies to shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices,' the Health and Human Services Department's office of inspector general said in a 2005 bulletin[.]").

[65] The idea behind the OIG guidance is not hard to see. If a drugmaker makes drug ABC and then donates to a charity for the purpose of a charity funding ABC co-pays, that can sometimes start to look like the drugmaker is seeking an illegal bang for its charitable buck. After all, a small payment from the drugmaker (to the charity, to cover the ABC co-pay) to increase the likelihood of a larger payout for the drugmaker (as more people opt for ABC) --- that can seem like a kickback. But if there is no real reporting back and forth between the drugmaker and the charity --- if the drugmaker funds a charity but does not know in a detailed way what the money is actually for --- then there is that much less concern that the drugmaker is donating with a hidden, bank-shot purpose, to increase prescriptions and prices, and with them payments to itself.

And those filings threw up unmistakable storm warnings --- explicit, easy-to-see suggestions of the "possibility," In re Merck, 543 F.3d at 164, that Teva's charitable donations related to Copaxone violated federal anti-kickback law.

The first sentence of the Teva/CDF donation agreement, the one discussed earlier, states that the relevant CDF program was wholly Copaxone-specific.

> The Foundation has an assistance program for patients being treated for multiple sclerosis with Copaxone who meet certain financial and medical criteria ("Program"), which may include assistance paying or reimbursing such patients' co-payments and co-insurance for that drug. [Teva Neuroscience], (the "Donor") desires to provide the Foundation with a donation for the Program.

2007 Teva-CDF Donation Agreement ¶ 1.

Covering Copaxone co-pays was the purpose of the arrangement --- and was what Teva was paying for.

> Donor shall endeavor to provide the Foundation with funding to support the Foundation's mission of providing co-payment and co-insurance assistance to patients meeting the Program's objective financial eligibility criteria, so that such patients may obtain Copaxone therapy for or in connection with multiple sclerosis[.]

Id. ¶ 4(a)

And Teva anticipated having real involvement in the Copaxone co-pay program.

Providing "initial funding in an amount sufficient to provide co-payment assistance for the remainder of [the year] for individuals [who were and would be in] the [Copaxone] Program" at a later date. Id. ¶ 4(b). Having "[i]nput," id. ¶ 3(c), into "eligibility criteria." Id. And aiming to cover real numbers of people prescribed Copaxone. Indeed, per the agreement, Teva "intend[ed] to provide sufficient funds to allow the Program to make co-payments for all Program participants for a full calendar year." Id. ¶ 4(a).

In light of all this, no surprise that CDF was obligated to provide detailed weekly and monthly reports to Teva as to the ins-and-outs of the Copaxone co-pays being covered.

> (b) The Foundation will make available to Donor weekly status reports that track the status of applicants to the program up to and including the first time that Copaxone is dispensed to such participant and monthly patient-level dispense data.
>
> (c) The Foundation will submit monthly reports . . . relating to the Program to Donor within fifteen (15) days after the end of each calendar month, unless Donor otherwise agrees to a less frequent reporting period. Monthly Reports will contain aggregate numbers of all Program applicants. Each Monthly Report will include the following elements in the aggregate for the Program:
>
> (I) Number of applications received for the Program;
> (II) Number of applicants accepted for the Program;
> (III) Number of applicants for the Program denied and reason(s) for denial;
> (IV) Average amount paid to recipients in the Program for cost sharing obligations (e.g., co-payment, co-insurance);
> (V) Total amount allocated to enrolled patients in the Program but not yet paid out.
>
> Subject to notice provision in Section 4(a), as part of the Monthly Reports, the Foundation will track and report to Donor how much of Donor's Donation remains available for use in the Program, as determined by objective criteria utilized by the Foundation. The Foundation may provide additional information in each Monthly Report as approved by the Board and the Foundation's legal counsel.

Id. ¶¶ 11(b)-(c).

* * *

Teva provided donations to CDF to cover Copaxone. See id. ¶ 1. And CDF reported back to Teva --- in detail, and regularly. See id. ¶ 11.

The tension between this reporting arrangement and the 2005 OIG kickback guidance is sharp, and plain to see.

Recall that, under the OIG guidance, "[r]eporting of data [from the charity to the drugmaker] . . . would be problematic" to the extent it "related to the identity, amount, or nature of subsidized drugs." 2005 OIG Guidance at 5-6 n.16.

And in black and white, that is precisely what the Teva/CDF agreement envisions.[66]

Especially to a sophisticated insurer like the Plaintiff, the Teva/CDF agreement was plainly a storm warning --- a blinking red light as to the "possibility" that illegal kickbacks were being paid by Teva.[67]

* * *

To conclude:

---

[66] The guidance is common sense. See footnote 65. Even without it, the agreement might well have provided a storm warnings heads-up.

[67] At the time of 2017 litigation, there was no reason to think this was all in the rear-view mirror. A federal law-enforcement officer's affidavit was the centerpiece of what was filed in the 2017 federal-court case. See Exhibit 11 to Bartle Declaration ("Agent Tai Declaration") (ECF 158-11). And it indicated that in 2011, of the roughly $129 million that CDF spent on co-pay assistance, roughly $123 million "or about 95%, was spent on drugs manufactured by the pharmaceutical manufacturer that made the 'donation' for the specific disease." Id ¶ 31. The affidavit explained that this close congruence was also there as to Teva's donations to CDF. See id. ¶ 34 (noting that "the percentage of co-pay assistance CDF spent on Teva general Multiple Sclerosis drugs was 46.65%," and that "Teva 'donated' 46.7% of the program funds for general Multiple Sclerosis drugs in 2011"). And as to Copaxone in particular. See Exhibit K to Tai Declaration at 4, Chronic Disease Fund, Inc. v. United States, No. 2:17-cv-00322 (W.D. Pa. May 18, 2017), ECF 12-2 (showing that Copaxone was the only MS drug manufactured by Teva that was covered by CDF during the relevant period).

Based in part on the 2017 IRS litigation --- which the Plaintiff should have been closely aware of, see Part III.B.1. --- it was obvious that there was a "possibility," In re Merck, 543 F.3d at 164, that Teva's Copaxone-related donations were violating the federal anti-kickback statute. Indeed, the Teva/CDF contract very strongly pointed in the direction of just that possibility. It required detailed and systematic reporting --- well beyond what, per the OIG's 2005 guidance, would raise anti-kickback concerns.

Given this, and in light of the information set out in Part III and the caselaw mustered there,[68] there can be no doubt that there were storm warnings as of the relevant date on the Plaintiff's ineligible patient theory. To the extent the Plaintiff's RICO claims rest on that theory, they are time-barred.

## V. Conclusion

The Plaintiff's RICO claims were filed too late and are therefore time-barred. See Part III, Part IV.

The Defendant's motion at ECF 156 is granted as to the federal RICO claims.[69]

---

[68] See also footnote 53. In re Merck does not bar the Court from considering the 2017 IRS Litigation materials here simply because that litigation revolved around an investigation into whether CDF had met the requirements for a certain tax exempt status, whereas this litigation hinges on RICO. Cf. 543 F.3d at 166-67. The 2017 litigation made clear that the investigation focused on whether CDF "operated for the benefit of private interests." Tai Declaration ¶ 19. The litigation documents went on to explain that the basis for this was in part that CDF "limit[ed] certain pharmaceutical manufacturer funds to be used almost exclusively for co-pay assistance for the drug or drugs made by that very same pharmaceutical manufacturer." Id. ¶ 27. And they mustered evidence that Teva's donations specifically were being used for the MS drug Copaxone. See id. ¶ 34. This directly tracks the Plaintiff's RICO theory here --- that certain co-pays were tainted with illegality due to potential violations of the federal anti-kickback statute. See Complaint ¶¶ 72-81.

[69] Two things here. First, note that no tolling argument can change the picture. The Plaintiff argues that the limitations period should be tolled because the Defendant "concealed the

IT IS on this 31st day of July, 2026, **SO ORDERED.**

___S/MichaelFarbiarz________
Michael E. Farbiarz, U.S.D.J.

---

central components of its scheme, making it difficult to discover." Complaint ¶ 175. But a civil RICO "plaintiff may not rely upon [this] 'fraudulent concealment' [theory] unless he has been reasonably diligent in trying to discovery his cause of action." Klehr v. A.O. Smith Corp., 521 U.S. 179, 182 (1997). So where a plaintiff has asserted that fraudulent concealment should toll the limitations period at the summary judgment stage, a court must determine, among other things, "whether there is sufficient evidence to support a finding that [the] plaintiff[] exercised reasonable diligence." Forbes v. Eagleson, 228 F.3d 471, 487 (3d Cir. 2000). But here, there is no indication that the Plaintiff took any meaningful steps, let alone sufficiently diligent ones. See Part II (noting that "the Plaintiff has not argued that it took any steps in the face of possible storm warnings"). Second, there is a quick reference in the operative pleading to the continuing violations doctrine --- which can sometime have an impact on a limitations-period analysis. See Complaint ¶ 174. But the Plaintiff has not pressed any such argument here. There is no reference to it in its legal briefs. It is not before the Court.